## In re HURRICANE ELKHORN COAL CORP. II, Debtor.

### Bankruptcy No. 38100203.

United States Bankruptcy Court,
W. D. Kentucky.

Dec. 22, 1981.

See also, Bkrtcy., 15 B.R. 990.

John P. Reisz, Reisz, Rice, Porter & Rosenbaum, Louisville, Ky., for debtor-in-possession.

Frederic H. Davis, Brown, Todd & Heyburn, Louisville, Ky., for Consumers Power Co.

James W. Halloran, Cors, Hair & Hartsock, Cincinnati, Ohio, James G. Apple, Louisville, Ky., for Logan and Kanawha.

## MEMORANDUM AND ORDER

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

Hurricane Elkhorn Coal Corporation II is a debtor-in-possession engaged in the coal mining business. About two years before it filed for Chapter 11 relief, Hurricane Elkhorn entered into an agreement with the Consumers Power Company, a Michigan utility, to supply coal every month for 15 years, beginning in April, 1979. The agreement provided that Hurricane Elkhorn would ship up to a total of 7,700,000 tons of coal over the 15 year span. The agreement further set a base price of $32 per ton

which, beginning in June of 1982, could be adjusted to reflect an increase or decrease in the cost of production and of government indices for consumer and producer prices. The price of $32 per ton is now considerably below the prevailing market price of coal. For that and other reasons, Hurricane Elkhorn moves the court for authority to reject the coal supply agreement it has with Consumers Power.

A full evidentiary hearing was not held. Both companies, however, have tendered memoranda with attached affidavits of knowledgeable company officials. The memoranda and affidavits, taken together, outline the effect which either rejection or acceptance would have on both parties.

Consumers asserts that if the agreement is rejected, it will incur damages of over $74.6 million through the time the contract expires in early 1994. Discounted for present value, the claim equals $30.9 million. Consumers arrives at its claim by comparing the projected price of coal under the Hurricane Elkhorn contract, adjusting for increases in production costs and applicable government indices, with the projected price of coal under a hypothetical alternate contract with a base price of $41 per ton, to which the same adjustments are made.

Consumers bases its contract price projection for the Hurricane Elkhorn contract on a limited review of Hurricane Elkhorn's cost records of January, 1981. Consumers has also factored in inflation rates for mine and freight costs, applying the same rates to both the Hurricane Elkhorn contract and the alternate hypothetical contract.

According to Consumers' figures, by 1994 the price for Hurricane Elkhorn's coal will have increased, as a result of yearly cost adjustments, from the base price of $32 to $111.95. The alternate contract price for 1994 is estimated at $123.79. When the freight cost, which Consumers pays, is added to the contract price, Consumers' cost under the Hurricane Elkhorn contract increases from $47.94 to $165.12, and under

the hypothetical contract from $57.30 to $178.21.

By drawing a comparison between the existing Hurricane Elkhorn contract and its hypothetical contract, Consumers hopes to highlight the loss it will suffer if rejection is permitted, and to demonstrate that the contract is fair to Hurricane Elkhorn.

Hurricane Elkhorn reads the effect of the contract differently. It avers that the net price it realized from the sale of its coal to Consumers was $28.32 per ton, and not the contract base price of $32 per ton. Hurricane Elkhorn arrived at the net price by subtracting from the $32 base price various costs not otherwise included in the cost of production: a 4% commission to a coal broker amounting to $1.28 per ton; a freight differential of $1.20; and $1.20 in additional trucking and tippling costs required to meet a contract provision that Hurricane Elkhorn load the coal so as to permit the loading of a 7,000 ton shipment per unit car train in less than six hours.

The cost of mining and processing the coal, excluding depreciation, amortization and interest charges, was $28.74 during the months of October, November and December of 1980. The cost for the month of July, 1981 was $31.43, though Hurricane acknowledges that the figure is higher than normal because it includes start-up costs incurred upon resuming mine operations after a long strike. Even if the lower production cost figure of $28.74 is relied upon, Hurricane Elkhorn realizes a net loss under the contract of at least $.42 per ton.

\* \* \*

Both parties correctly identify the two principal standards applied in considering the rejection of executory contracts—the "onerous and burdensome" test, and the "business judgment" rule.

The "onerous and burdensome" standard is the less favored of the two. Under that test, an executory contract can be rejected only when continued performance under it would result in an actual loss to the estate.[1]

1. *American Brake Shoe & Foundry v. New*     *York Rys. Co.,* 278 F. 842 (S.D.N.Y.1922); *In*

The rigidity of the burdensome test makes its use unappealing. It lacks the flexibility that should be inherent in the bankruptcy court's exercise of its discretionary and equity powers in determining what contracts do and do not promote the best interest of an estate. Further, in light of the Supreme Court's reliance on the business judgment test in *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R. Co.*[2] we think the business judgment rule to be the preferable standard.

■ Hurricane Elkhorn has presented evidence that if the contract is not rejected, the estate will suffer a loss.[3] The net price presently realized by Hurricane Elkhorn for the coal is less than the cost of producing it.[3a]

Consumers does not directly refute Hurricane Elkhorn's proof. Its projection of the price Hurricane Elkhorn might receive for its coal in the future does not take into account the future production costs to Hurricane Elkhorn.

We are not unmindful of the economic disadvantage to Consumers Power of contract rejection. We have considered its contention that it will have to pay much more for replacement coal under a new contract. The injury done to the non-rejecting party, though worthy of consideration, should not, however, control the outcome.

Our primary concern when dealing with rejection of a contract in Chapter 11 is the

impact continued performance under the contract will have on the reorganization attempt of the debtor-in-possession. If rejection will aid reorganization, as it will here, then creditors at large stand to benefit. If this contract is not rejected, Consumers Power will have reaped a substantial benefit, but it will have come at the expense of the estate and other creditors.[4]

We note as a final, though by no means controlling, factor that Hurricane Elkhorn will upon rejection of this contract be able to sell its coal for considerably more than $32 per ton. At least one court has held that the availability of a more lucrative contract constitutes sufficient grounds for rejection.[5] We need not deal with that specific issue. There are other reasons, as outlined above, for us to find, in applying the prevailing meaning of the business judgment test, that rejection of this executory contract should be permitted because it will benefit the estate.[6]

■ We address finally the question, raised by both parties, of whose business judgment—the Court's or the rejecting party's—should be applied. A trustee or debtor-in-possession can reject or assume only with court approval.[7] To the extent the court concurs in a trustee's or debtor-in-possession's exercise of business judgment, the court can adopt that judgment as its own. The Court, however, is the party ultimately charged with the duty of applying the business judgment test to the facts of each case.[8]

---

*re Vidicom Systems, Inc.*, 2 BCD 2 (S.D.N.Y. 1975).

**2.** 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943).

**3.** For this reason, Hurricane Elkhorn asserts that under either the burdensomeness or business judgment test the agreement may be rejected. That is likely true, though our conclusions are reached by applying the business judgment test.

**3a.** Unlike a similar matter in which we have today entered an order permitting Hurricane Elkhorn to reject a contract with Cincinnati Gas & Electric Company, we are in this case not able to say upon a reading of the contract and the evidence that continued performance

by Hurricane Elkhorn would result in continuing losses.

**4.** See e.g. *Matter of Minges*, 602 F.2d 38, 43 (2nd Cir. 1979).

**5.** *In re J. H. Land & Cattle Company, Inc.*, 8 B.R. 237 (Bkrtcy.W.D.Ok.1981).

**6.** *Matter of Minges*, supra note 4. *In re Lafayette Radio Electronics Corp.*, 8 B.R. 528 (Bkrtcy.E.D.N.Y.1981).

**7.** 11 U.S.C. § 365(a).

**8.** *Matter of Tilco*, 558 F.2d 1369, 1372 (10th Cir. 1977); *In re J. H. Land & Cattle Company*, supra note 5 at 239.

By reason of the authority and reasoning contained herein, the Application for Authority to Reject the Coal Supply Agreement between Hurricane Elkhorn Coal Corporation II and Consumers Power Company and Logan & Kanawha Coal Company, Inc., is HEREBY ORDERED approved.