### In re RESERVE ROOFING FLORIDA, INC., Debtor.

### Bankruptcy No. 81–184–ORL–BK–GP.

United States Bankruptcy Court,
M. D. Florida,
Orlando Division.

May 20, 1982.

Charles R. Fawsett, Sp. Counsel, Michael Williamson, Orlando, Fla., for Reserve Roofing.

John J. Chamblee, Tampa, Fla., for Unions.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This cause was heard on April 27, 1982 on the application of the Debtor, Reserve Roofing Florida, Inc., for authority to reject two collective bargaining agreements. This Court has jurisdiction pursuant to Title 11, U.S.C. § 1101, *et seq.* The application of the Debtor is heard pursuant to Title 11, U.S.C. § 365.

Having received and heard evidence from the Debtor and both labor organizations involved, the Court makes the following findings of fact and conclusions of law.

1. The Debtor, Reserve Roofing Florida, Inc., a roofing contractor, instituted this proceeding under Chapter 11 of the Bankruptcy Code on March 18, 1981. On February 10, 1982 the Debtor filed its application

for authority to reject two collective bargaining agreements to which it is party. These agreements are with Local Union No. 254 and Local Union No. 179 of the United Union of Roofers, Waterproofers and Allied Workers, AFL–CIO. Both local unions are labor organizations as defined in § 2(5) of the Labor Management Relations Act, 29 U.S.C. 152(5). Both unions were duly served with the application.

2. In its application the Debtor asserts that it entered into a collective bargaining agreement with Local Union No. 179 on May 3, 1978 and that on October 1, 1981 the agreement was renewed. A copy of the agreement as renewed is in evidence, showing that it was entered into October 1, 1980. The Debtor alleges in its application that on August 1, 1981 it entered into a renewal of an agreement between Local Union No. 254 and a multiemployer association. A copy of the agreement as entered into by the Debtor on August 1, 1981 is in evidence. There was no evidence as to what alterations, if any, in contract terms were made between the parties upon renewal, or as to whether renewal was automatic or by mutual agreement. There was evidence that the parties had adhered to the terms of these agreements.*

3. On or about March 30, 1982 both local unions filed jointly a pleading entitled "Objection to Application of Debtor for Order Granting Authority to Reject Executory Contracts". This pleading did not deny any facts alleged in the application, although it asserted that the Debtor is not entitled to the relief sought, authority to reject the two agreements. The pleading filed by the unions did not seek to have the Debtor assume or adopt either agreement. Nor did the unions assert at the hearing that the Debtor should be required to affirm or adopt either agreement.

4. The position of the Debtor is that it should be granted authority to reject the two agreements because they are burdensome and onerous in two ways: First, the agreements, primarily by requiring payments of money, require the Debtor to pay more for labor than it contends it otherwise would have to pay to perform its contracts. Second, the Debtor contends that the agreements place it at a serious competitive disadvantage with the other roofing contractors in Central Florida operating in the same market.

The position of the unions is that the Debtor should not be allowed to reject the agreements because such action would cause hardship to employees of the Debtor.

5. Under the agreements the Debtor must employ persons furnished by the unions upon request, to the extent the unions are able to furnish employees. All production employees, whether foremen, journeymen, helpers, apprentices, laborers or other categories are required to be paid the wages set forth in the agreements regardless of whether furnished by or through the union. Further, monies are required to be paid per employee-hour worked to the National Roofing Industry Pension Fund, the health and welfare funds of the respective local unions and to an apprenticeship fund.

6. The Debtor presented five witnesses and various documentary exhibits. The Debtor proved through the testimony of its president, Joseph Lampe, Robert F. Kurr, Assistant Executive Director of the local chapter of the Associated Builders and Contractors of America and John Basso, the vice president and manager of a non-union roofing firm in Orlando, Florida, that the average and typical wage paid to roofers at the time of the hearing was $8.00 to journeymen ($9.00 and up to highly qualified journeymen of foremen caliber) and $6.00 or less, sometimes as little as $4.50 to helpers and laborers. (Mr. Basso's firm starts journeymen at $7.00). Mr. Kurr stated that, according to a survey (Debtor's Exhibit 3) made by him of various non-union roofing contractors which are members of his association, that the average wage paid to journeymen roofers was $7.78 as of October, 1981 and remains approximately the same at this time. Mr. Lampe and Mr. Basso established without contradiction

* See Appendix.

that it is feasible and, in Mr. Basso's case, customary to hire and retain roofers to perform contracts such as those performed by the Debtor and by Mr. Basso's company without going through a labor union and at the rates above discussed. Based on their testimony, which included a discussion of the types of roofing contracts performed by the Debtor, by Mr. Basso's company, L. F. Still & Company, and by other roofing contractors of the approximate size of the Debtor, I find that the Debtor would be able, in the absence of the subject agreements, to regularly staff its projects with qualified roofers, laborers, helpers, etc. without referrals from the unions by hiring at and paying the rates above discussed. These rates are to be contrasted with the rates now in effect under the agreements, and those to be in effect within the few months following the time of the hearing. (These rates are set forth in full in Attachment 1 hereto).

Mr. Lampe and Mr. Basso stated, and I find, that it is not the practice in the roofing industry in Central Florida for non-union contractors to pay pension benefits, health and welfare benefits or apprenticeship benefits. I find that the Debtor could adequately staff its projects without offering these considerations to production employees.

7. The Debtor presented considerable documentary evidence, none contested as to veracity, to show the approximate amount of its additional labor expenses incurred by reason of adherence to the subject agreements compared to labor expenses which would have been in the past and would be in the future incurred in the absence of the agreements. Based on man hours worked by the Debtor between January 1, 1981 and the date of the hearing, the Debtor, paying the rates testified to by Mr. Lampe, Mr. Kurr and Mr. Basso, would have saved $25,-365.70 had it not been required to adhere to the agreements. (Debtor's Exhibit 6). This sum included $7,573.71 in pension, health and welfare and apprenticeship payments. (Debtor's Exhibit 7). The Debtor estimated the number of man hours it would work between May 1, 1982 and the remaining terms of the two agreements in the territories covered by the two agreements. Assuming 8 employees and 1387 man hours worked under the Local No. 254 (Orlando) agreement, the Debtor would save $77,-394.60 between May 1, 1982 and July 31, 1983, expiration time of the agreement by operating without the Local 254 agreement. (Debtor's Exhibit 8). The Debtor estimated, on the basis of three employees employed between May 1, 1982 and the expiration of the Local 179 (Tampa) agreement, September 30, 1983, that 520 man hours would be worked and that a savings of $33,857.20 would be achieved by operating without the Local 179 agreement. (Debtor's Exhibit 8). None of these comparisons took into account the additional $.75 per hour "pitch pay" called for in the Local 254 agreement.

In view of the $133,670.45 which Court records (Debtor's Reports 1–13) show the Debtor spent for labor since filing of this proceeding, these amounts are material.

8. The Debtor contends (correctly) that the agreements require it to operate in a manner which is not necessary to performance of its contracts yet involves expense beyond the disparity between the union rates and what the Debtor terms fair market value rates. The Debtor points to provisions of the contracts prohibiting the use of helpers in the actual application of roofing materials. To the extent that helpers making $6.00 per hour or less can properly be utilized in such work, and I find, based on undisputed evidence, that they can be, these provisions are unnecessarily burdensome on the Debtor.

9. Based upon the foregoing evidence, I find that the Debtor, by reason of the subject agreements, has incurred in the past, is incurring and will continue to incur significant expenses which are not necessary to the performance of the contracts which the Debtor has been obtaining and performing during the course of this proceeding.

10. The Debtor further contends that in addition to being an unnecessary direct burden, the agreements constitute a severe det-

riment to it in obtaining work. The Debtor obtains its work solely on a basis of competitive bidding with other contractors. It is customary for owners to accept the lowest bid. The Debtor's market consists of relatively small commercial roofing jobs, between $20,000.00 and $150,000.00 in magnitude. Mr. Lampe and Mr. Basso testified that this market is a non-union market. The evidence shows that there are only about three "union" roofing contractors operating in Central Florida, and that there are approximately one hundred non-union roofing contractors operating in the same market. The evidence suggests that the union roofing contractors are larger, and tend to bid against each other for the larger work, including work at Walt Disney World, Sea World and other places where construction work is bid and performed exclusively on a "union" basis. Mr. Lampe stated, corroborated by Mr. Basso, an independent witness, that a small union roofing contractor operates in Central Florida at a serious competitive disadvantage in bidding against non-union contractors. Based on the testimony given by them and by Mrs. Herdina, a director of the Debtor with experience in the roofing business in several states, and in consideration of Debtor's Exhibit 4, a labor breakdown for a $90,000.00 bid for a hypothetical roofing project showing a $9,734.40 difference between union and non-union labor, it is apparent that the range between the highest bid and the low bid on typical roofing jobs of the size and sort performed by the Debtor can be accounted for by the difference between what the Debtor must pay for its labor and what non-union contractors pay for theirs. Mr. Basso stated, in fact, that when bidding against a union contractor he does not consider the union contractor to be part of his company's competition. I thus find that the agreements place an additional burden on the Debtor which is obstructive to its continued viability and profitability as a going concern.

11. In contrast to the burden and detriment caused the Debtor by these agreements, the unions have not established that any significant loss will accrue to them or to any employees of the Debtor by reason of rejection. The hiring and employment provisions of these agreements point to a basic distinction between this case and the cases cited by the unions in their objection. The Debtor, contrary to the employers in those cases, employs production workers only on an as-needed, per project basis; the only permanent employees employed by the Debtor are its president, who is also the superintendent and estimator, and a secretary-bookkeeper-receptionist. The Debtor, unlike the employers in the decisions cited by the unions, does not have a permanent complement of employees (see Debtor's Exhibit 5, an employment flow chart) who would lose, by reason of rejection, any accrued or vested monies or other things of value which have accrued to them by reason of their employment. No evidence was adduced as to any loss or the amount thereof which would be caused any identifiable individual or group of individuals if the agreements were rejected. There was no evidence that any person would cease membership in the union or would cease making payments of money to the unions upon rejection. It was suggested that "union" persons presently working for the Debtor, if they wished to remain employees of the Debtor, would upon rejection have to drop out of the union, but there was no evidence that this would happen and no suggestion that it would occur other than by the choice of the affected persons. The business agent of the union, Mr. Willis, testified that employees of the Debtor would cease to accrue and under certain circumstances as to which no precise evidence was offered could lose pension and health and welfare benefits by reason of rejection. However, he acknowledged that they would only cease accruing or possibly lose such benefits to the extent, if at all, that they were employed by the Debtor *at* the time of rejection *and* were not thereafter referred to other work for contractors signatory to a union agreement. *All* employees of the Debtor referred by the unions lose their jobs in all events at the end of a project and must be re-referred by the union if they are

to keep up their pension and health payments. Mr. Willis stated that at times there is an oversupply of work relative to available union workers, and at times the opposite situation prevails, and that it is hard to predict what situation will prevail at a given time. There was thus no clear evidence that any employees of the Debtor would suffer losses, and no suggestion as to amounts of losses which would accrue to any particular individuals as a result of rejection.

12. Based upon the foregoing, I find that the agreements are burdensome and onerous within the meaning of cases decided under § 365 of the Act and its predecessors and that rejection of the agreements would be significantly to the advantage of the Debtor. I further find that the equities and advantages to the Debtor of rejection of these agreements weigh substantially in favor of rejection, as opposed to the disadvantages and losses, if any, to the union and any employees represented by it.

## CONCLUSIONS OF LAW

1. To the extent it may be argued that either of the agreements involved herein was entered into or modified following institution of this proceeding by the Debtor, it is the conclusion of this Court that, under § 365 of the Code, this Court has power to authorize rejection of an executory contract of the Debtor regardless of whether entered into or renewed following filing of the Chapter 11 petition. A postpetition executory contract which is rejected upon the authority of the Bankruptcy Court is nonetheless deemed to have been breached as of the time of filing of the Chapter 11 petition, and the agreements involved herein will be deemed breached as of that time.

2. The Debtor has urged that the "business judgment" test of such cases as *Matter Of Minges*, 602 F.2d 38 (2nd Cir. 1979) be utilized in determining whether this Court should authorize rejection of the subject contracts. This test was recently approved in *In Re Marina Enterprises, Inc.*, 14 B.R. 327, 333 (Bkrtcy.S.D.Fla.1981). Another

recent Bankruptcy Court decision urging the relative desirability of the business judgment test as opposed to the "onerous and burdensome" test, citing the need for flexibility in adjudicating matters in bankruptcy proceedings, is *In Re Hurricane Elkhorn Coal Corporation II*, 15 B.R. 987, 988–989 (Bkrtcy.W.D.Ky.1981). At least two courts have utilized the business judgment test or one substantially similar in authorizing rejection of collective bargaining contracts. See *Local Joint Executive Board, AFL–CIO, etc. v. Hotel Circle, Inc.*, 419 F.Supp. 778 (S.D.Cal.1976), affirmed *Local Joint Executive Board, AFL–CIO, etc. v. Hotel Circle, Inc.*, 613 F.2d 210 (9th Cir. 1980), and *In Re Klaber Brothers, Inc.*, 173 F.Supp. 83 (S.D.N.Y.1959). The unions contend that the Court should apply the assertedly more strict standard said to be applicable to rejection of collective bargaining contracts, as opposed to other types, as described in *Shopmen's Local Union No. 455, etc. v. Kevin Steel Products, Inc.*, 519 F.2d 698 (2nd Cir. 1975) and in *In the Matter of David A. Rosow, Incorporated*, 9 B.R. 190, 7 B.C.D. 357 (Bkrtcy.D.Conn.1981). *Rosow* purports to hold, based on *Kevin Steel, supra*, and another Second Circuit case, *Brotherhood of Railway, Airline and Steamship Clerks, etc. v. REA Express, Inc.*, 523 F.2d 164 (2nd Cir. 1975), that a labor contract should not be rejected unless it is found that it is so burdensome that the debtor will collapse in the absence of rejection. This Court does not view *Kevin Steel* or *REA Express* as containing such a requirement. These cases essentially hold that greater scrutiny should precede rejection of a labor contract than rejection of an ordinary commercial contract, and that rejection should not be authorized unless it is shown that the equities weigh decidedly in favor of rejection, based upon competent evidence. The Court need not decide here whether any different standard should be applied to rejection of a labor contract, since the Court has found that in this case the equities weigh heavily in favor of rejection. As above found, no permanent or other employees of the Debtor will lose jobs or other things of value, either tangible items or

valuable rights, by reason of rejection. This factor distinguishes the instant situation materially from *Rosow, Kevin Steel* and *REA Express, supra.*

3. Based upon the foregoing it will be the order of this Court that the Debtor be authorized to reject the agreements between itself and Roofers Local Unions No. 254 and No. 179. Upon rejection, the contracts will be treated as having been breached as of March 18, 1981, and the unions shall be allowed, if they wish, to file proofs of claim.

## APPENDIX

### LOCAL 254 AGREEMENT

| | Wage | Health & Welfare | Pension | Appr. Fund |
|---|---|---|---|---|
| **August 1, 1981** | | | | |
| Foremen | $10.75 | .40 | .25 | .05 |
| Journeymen | 10.00 | .40 | .25 | .05 |
| Kettlemen | 8.55 | .40 | .25 | .05 |
| Helpers & Tile Tenders | 7.90 | .40 | .25 | .05 |
| **February 1, 1982** | | | | |
| Foremen | $11.25 | .45 | .25 | .10 |
| Journeymen | 10.50 | .45 | .25 | .10 |
| Kettlemen | 9.05 | .45 | .25 | .10 |
| Helpers & Tile Tenders | 8.40 | .45 | .25 | .10 |
| Foremen | $11.75 | .45 | .35 | .10 |
| Journeymen | 11.00 | .45 | .35 | .10 |
| Kettlemen | 9.55 | .45 | .35 | .10 |
| Helpers & Tile Tenders | 8.90 | .45 | .35 | .10 |
| **February 1, 1983** | | | | |
| Foremen | $12.25 | .45 | .45 | .10 |
| *Journeymen* | 11.50 | .45 | .45 | .10 |
| Kettlemen | 10.05 | .45 | .45 | .10 |
| Helpers & Tile Tenders | 9.40 | .45 | .45 | .10 |

Pitch Pay – Employees will receive Seventy-five (75) cents per hour above regular wage rate, except for Kettlemen which will receive One Dollar and Fifty Cents ($1.50) above their regular rate in accordance with Article V, Section 12.

### LOCAL 179 AGREEMENT