In re PARROT PACKING COMPANY, INC., Debtor.

Bankruptcy No. 83–10127.
Misc. No. FM 83–38.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Aug. 2, 1983.

**324**

Grant F. Shipley, Fort Wayne, Ind., for debtor.

John R. Burns, III, Fort Wayne, Ind., for Fort Wayne National Bank (secured creditor).

Thomas Scherer, Bamberger & Feibleman, Indianapolis, Ind., John C. Theisen, Gallucci, Hopkins & Theisen, Fort Wayne, Ind., for Creditors' Committee.

Irvin M. King, Chicago, Ill., for Local Union.

## ORDER

LEE, District Judge.

This bankruptcy matter is before the court on the "Application of Creditors' Committee to Require Debtor to Reject Collective Bargaining Agreement or Alternatively for Authority to Reject Collective Bargaining Agreement on Debtor's Behalf" filed July 7, 1983. On July 11, 1983 the court granted a "Petition for Withdrawal of Reference" from the bankruptcy court pursuant to Local Rule 28(c)(2) for the limited purpose of hearing the above referred to application. Hearings were conducted on July 21 and July 27, 1983. Represented at the hearings were the debtor in possession, the Creditors' Committee, the Fort Wayne National Bank, and Local 280, United Food and Commercial Workers International Union, AFL–CIO. Having heard the evidence and being duly advised in the premises, the court now enters the following findings of facts and conclusion of law.

### Findings of Facts

1. Parrot Packing Company, Inc. is the debtor in possession in Bankruptcy Cause No. 83–10127 in the United States Bankruptcy Court for the Northern District of Indiana, Fort Wayne Division, having filed a voluntary petition for relief on February 18, 1983.

2. The official Creditors' Committee of Parrot Packing Company, Inc. represents many creditors in the reorganization and is a party in interest under 11 U.S.C. § 1109(b).

3. The Fort Wayne National Bank is a creditor having a security interest in the bulk of the assets of Parrot Packing Company, Inc.

4. Local 280 of the United Food and Commercial Workers International Union, AFL–CIO, represents the hourly employees of Parrot Packing Company, Inc. other than managerial, supervisory, sales and clerical employees.

5. Parrot Packing Company is a packing company in the business of processing and selling consumer meat products, including hot dogs, sausage, cold cuts and hams. These products are distributed principally in northeast Indiana, with concentration in the Fort Wayne area.

6. The company's business is seasonal. The summer months are generally the best months for the sale of hot dogs, cold cuts, and smoked meats, while the holiday periods (Easter, Thanksgiving and Christmas) are generally the best months for the sale of hams.

7. Parrot Packing Company owns a single facility in Fort Wayne, Indiana, originally constructed in 1923 and added on to from time to time since that date.

8. Parrot Packing Company is a Subchapter "S" corporation, the shares of

which are owned by approximately eleven different people. The shareholders last received a dividend on their shares in 1980, the last year in which Parrot Packing Company earned a profit.

9. Since 1980, Parrot Packing Company suffered continual losses from its operations. In 1981 its losses from operations were $122,738. In 1982, its losses from operations were $606,566. During the first six months of 1983, the company's losses have been in excess of $308,250.

10. Conscious of these staggering losses, Parrot Packing made several efforts to cut expenses. One such effort involved the closing of a hog slaughtering operation in October of 1982, since that operation turned a net loss of approximately $600,000 during that year.

11. Prior to the closing of the hog slaughtering operation, Parrot Packing had attempted to reduce losses through a reduction in its labor costs. Beginning in 1981, the company and the union met to discuss possible concessions, whereby Parrot Packing could contain its labor costs. At the time of those initial negotiations, there were approximately one hundred workers actively employed in the bargaining unit at Parrot Packing Company, represented by the union. Through the negotiations, the union agreed to forego certain scheduled pay increases, including two cost-of-living adjustments. At that time, no wage reductions were negotiated, and between 1981 and October of 1982 one cost-of-living increase was granted pursuant to the collective bargaining agreement.

12. In October, 1982, the then existing collective bargaining agreement expired, and the company and the union negotiated a new collective bargaining agreement for the period between October 10, 1982 through October 12, 1985. That agreement, though still unsigned, is being adhered to by the parties. The union made many concessions in the new agreement. The union granted wage and benefit concessions totaling $2.04 per hour. Under the new wage scale, the base wage rate is $8.00 per hour. The average wage rate is $9.06 per hour and the average employee compensation (including fringe benefits) is $10.91 per hour. The union gave up one holiday, Columbus Day, and also gave up four hours of vacation pay. The union further decreased funeral days from five days to three days. The union further gave up its free hot lunch program and five minutes per day allocated for clothes changing.

13. The number of workers actively employed in the bargaining unit at Parrot Packing Company has consistently declined since the closing of the hog slaughtering operation. Prior to the closing of the hog slaughtering operation, there were in excess of one hundred workers actively employed in the bargaining unit. On October 10, 1982, there were sixty union employees actively working. At present there are approximately forty-three union employees on active status and another thirty-nine employees on lay-off status.

14. Aside from the concessions from the labor union, Parrot Packing has also reduced some of its labor costs with respect to its other non-union employees. These non-union employees include seven managerial employees; seven supervisory employees; five sales employees; and five clerical hourly employees. Prior to Parrot Packing Company's efforts to reduce labor costs, which became of critical importance with the closing of the hog slaughtering operation in October of 1982, there were eleven managerial employees; eleven supervisory employees; seven sales employees; and seven clerical hourly employees. Thus, from October of 1982 to July 22, 1983 the number of non-union employees at Parrot Packing Company has been reduced from thirty-six such employees to twenty-four employees. The duties of the non-bargaining unit employees whose positions were eliminated during this period were assumed by the remaining managerial or supervisory employees, without additional compensation. In October of 1982, Parrot Packing Company imposed a ten per cent pay reduction on its managerial salaries. Further, on July 1, 1983, there was a 19.8%

reduction in total compensation for managers, 3.92% of which was in the form of withdrawal of automobiles previously leased by the company for personal use by managerial employees.

15. While Parrot Packing Company has reduced its labor costs with respect to its non-union employees by eliminating some positions and reducing managerial salaries, these cuts have not been as substantial as those suffered by union employees. This can best be seen in terms of a percentage between what the employees received in total compensation on October 10, 1982 and what they were receiving in terms of total compensation as of July 22, 1983. Between October 10, 1982 and July 22, 1983, principally as a result of the July 1, 1983 reduction, the monthly average compensation for managerial employees had dropped from $2,938 per month to $2,607 per month meaning that the average compensation for managerial employees on July 22, 1983 was 88.73% of the amount received as of October 10, 1982. A markedly greater reduction was borne by the union employees. Between October 10, 1982 and July 22, 1983, the average monthly pay of union employees had declined from $1,468 per month to $1,086 per month, meaning that the average pay for union employees on July 22, 1983 was 72.49% of the average earned as of October 10, 1982. In contrast, all non-union employees, with the exception of managerial employees, were receiving higher average monthly compensation on July 22, 1983 than they had on October 10, 1982. During that period, supervisory personnel went from an average monthly rate of compensation of $1,636 to $1,660 for an increase of 1.46%; sales people went from an average rate of compensation of $1,153 per month to an average monthly rate of $1,160 for an increase of .061%; and hourly/clerical personnel went from an average monthly rate of $828 per month to $935 per month for an increase of 12.92%.

16. Notwithstanding the reduction in wage and salary expenses, Parrot Packing Company continues to incur losses. This had led to understandable concern on the part of certain creditors and in particular the Fort Wayne National Bank.

17. The Fort Wayne National Bank is the principal commercial lender and secured creditor of Parrot Packing Company. Other than the lessors of certain equipment, Fort Wayne National Bank is the sole secured creditor of Parrot Packing Company, having security interests in real estate, buildings, fixtures, equipment, inventory, and accounts receivable.

18. As of February 18, 1983, Parrot Packing Company owed the Fort Wayne National Bank approximately $700,000. The balance presently due and owing to the bank has grown to approximately $850,000. As of early June, 1983, the assets of the debtor in which the Fort Wayne National Bank has a security interest has a liquidation value of between $812,149.76 and $1,292,249.50.

19. Though current, as of February 18, 1983, in its payments to general creditors and in its principal and interest payments to the Fort Wayne National Bank, Parrot Packing Company had failed to maintain the level of inventory and accounts receivable required by its loan agreement with the Fort Wayne National Bank and thus, was in default of the loan agreement. Because of that fact and because of the continued operating losses, Fort Wayne National Bank deemed its secured position to be threatened, and called its loans on the morning of February 18, 1983.

20. Parrot Packing Company on February 18, 1983 filed its Petition in Bankruptcy in the United States Bankruptcy Court for the Northern District of Indiana. In addition to the amount due and owing the bank, Parrot Packing Company was indebted to general unsecured creditors in the approximate amount of $365,000.

21. Shortly after the filing of the bankruptcy, Fort Wayne National Bank moved to prohibit the use of its collateral including proceeds. Upon the showing by Parrot Packing Company that its appraisals indicated an equity cushion available to the Fort Wayne National Bank as adequate protection, however, the bankruptcy court

permitted the continued use by the debtor of the bank's collateral.

22. Because Parrot Packing Company continued to show losses, and the equity cushion continued to dwindle, the Fort Wayne National Bank, on May 31, 1983, renewed its motion to prohibit the use of collateral and sought an order directing a liquidation of the company. The bank's motion is predicated on the continued substantial operating losses of Parrot Packing Company and the debtor's failure to maintain substantially the same level of accounts receivable and inventory as existed on the date of filing and as required by the bankruptcy court's order for adequate protection. A hearing on that motion has been rescheduled in the bankruptcy court for August 5, 1983.

23. Since the filing of the petition for reorganization, Parrot Packing Company has continued to sustain losses. In March, 1983, Parrot Packing Company sustained operating losses totaling $35,955; in April of 1983, Parrot Packing Company sustained losses of $54,615; in May, 1983, those losses totaled $25,450; and in June of 1983, the losses totaled $20,458.

24. The losses sustained by Parrot Packing in June and July of this year are less than those in the immediately preceding months principally because Parrot Packing has been able to institute reduced prices for its product as a result of the various labor costs reductions. Reduced costs are necessary to continue to curb losses because the industry in which Parrot Packing competes is extremely price sensitive.

25. As part of its effort to reorganize, Parrot Packing Company has rejected many equipment leases and other executory contracts in order to minimize expenses. Parrot Packing Company has not, however, attempted to reject the collective bargaining agreement with Local 280. After receiving the Creditors' Committee's objections to the assumption of the collective bargaining agreement, Parrot Packing Company approached the union and requested the opening of negotiations for contract modification. The proposal to open negotiation was placed before the membership of Local 280 which overwhelmingly voted not to reopen negotiations.

26. Parrot Packing Company has declined to reject the collective bargaining agreement, concerned that such a rejection would invite charges of unfair labor practice.

27. Parrot Packing Company's concern with the possibility of unfair labor practice charges is genuine. Although no Chapter XI reorganization plan has yet been proposed, Parrot Packing Company is seeking investors or purchasers for the business. The possibility that unfair labor practice charges might be brought could only serve to put a cloud on any negotiations for a sale and inhibit potential investors.

28. If the collective bargaining agreement is rejected, Parrot Packing Company has indicated its intention to put in effect a wage scale embracing the concessions requested in October of 1982 but not granted at that time. The new wage scale would result in a reduction of total compensation by $2.62 an hour but would not reduce or modify any pension or retirement benefits.

29. The proposed rate is higher than the four to five dollars per hour found in the industry in some parts of the country but considerably lower than the prevailing rate of seventeen to eighteen dollars per hour found in the larger packing plants. That proposed rate is also lower than any of the wage rates at the other three plants represented by Local 280, but those plants are all considerably larger than is Parrot Packing Company.

30. In light of present unemployment levels in the Fort Wayne area, in the event there is a forced liquidation of Parrot Packing Company, it is more likely than not that the present employees of Parrot Packing Company will be able to find work either in the packing industry or elsewhere.

31. The proposed additional wage concessions will result in a monthly savings of approximately $10,000 per month. This amount of savings, if passed along to con-

sumers by price reductions, could have a substantial impact in terms of recovery for Parrot Packing Company.

32. The evidence shows a willingness by all parties to share in the economic burdens of the company. Those parties include the shareholders who have received no benefits since 1980; managerial employees who have taken post-petition salary reductions; unsecured creditors who have received no payments; the union which has made numerous concessions over recent years; and the Fort Wayne National Bank which has permitted a continuance of the hearing on its motion to prohibit the use of collateral.

33. Notwithstanding the cooperation by all of the parties, it is clear that something more needs to be done in order to save Parrot Packing Company from liquidation. As the equity cushion continues to dissipate, it is apparent that the bank will vigorously press for a liquidation. Since the market for Parrot Packing Company's products is presently price sensitive, to increase sales, Parrot Packing Company must reduce its prices. To reduce its prices, Parrot Packing Company must reduce its costs. If the costs are not reduced in the immediate future, liquidation of Parrot Packing Company is inevitable.

34. The present condition of Parrot Packing is such that further reductions in costs are necessary if the company is to survive.

35. It is clear from the evidence presented that the request for the rejection of the collective bargaining agreement is not accompanied by an improper motivation to oust or undercut the union as the collective bargaining agent. Rather, the evidence shows that Parrot Packing Company has respected the rights of the employees as required by the National Labor Relations Act. Indeed, the company has been operating under the collective bargaining agreement even though it has never been signed by the union. There is no evidence suggesting that the petition in bankruptcy was filed for the purpose of undoing the collective bargaining agreement.

## Conclusions of Law

This case, essentially, presents two issues for consideration, one of which appears to be a novel question of law while the other presents an issue over which numerous courts have struggled without reaching an accord. The first issue relates to the standing of the Creditors' Committee to bring this action while the second issue relates to the proper standard to be employed in determining whether or not a collective bargaining agreement should be rejected. Since the second question need only be addressed if "standing" is found to exist, it is to that issue—standing—which the court now turns.

### Standing of the Creditors' Committee

At the time the petition in bankruptcy was filed by Parrot Packing Company, there existed a collective bargaining agreement between Parrot Packing Company, the debtor in possession, and Local 280 of the United Food and Commercial Workers International Union, AFL–CIO, for the period commencing October 10, 1982 through October 12, 1985. It is a collective bargaining agreement within the meaning of the National Labor Relations Act and is an executory contract within the meaning of 11 U.S.C. § 365. *See* text at *18, infra.*

The debtor in possession has not attempted to reject the collective bargaining agreement nor does it appear that it has any intention of attempting to do so. Rather, Parrot Packing Company has maintained its stance that any attempt, on its part, to reject the agreement could be viewed as an unfair labor practice prohibited by the National Labor Relations Act. Not wanting to unnecessarily expose itself to potential liability and potentially protracted litigation, and wanting to insulate itself as much as possible, the debtor has opted for supporting the Creditors' Committee's request to reject. Because Parrot Packing Company is reluctant to seek rejection on its own behalf, the question presented is whether the Creditors' Committee, appointed under 11 U.S.C. § 1102, and exercising, inter alia, those powers described in 11 U.S.C. §§ 1103 and 1109(b), has standing to seek

rejection of the collective bargaining agreement under 11 U.S.C. § 365. Both the Creditors' Committee and the debtor in possession argue that such standing exists in this case and further that this court has plenary authority to confer such power upon the Creditors' Committee. The union, on the other hand, in its well presented arguments, is of the view that the Creditors' Committee has no standing to bring this request, nor can any such standing be inferred.

■ As all parties to the present dispute recognize, no court has addressed the precise issue before this court. Many courts have, however, addressed the standing of creditor committees in other contexts and, for the most part, have found such standing to exist. This court's review of the cases and the pertinent statutes leads it to the conclusion that standing does exist for the Creditors' Committee to bring this action. That conclusion stems from the following considerations.

Upon its filing of a petition for relief under 11 U.S.C. § 1101, *et seq.*, Parrot Packing Company became a debtor in possession. Since no trustee has been appointed in this case, the debtor in possession exercises the majority of powers possessed by a trustee. 11 U.S.C. §§ 1107, 1106. Functioning much like a trustee, Parrot Packing Company, as the debtor in possession, has certain avoidance and recovery powers which are usually exercised in an adversary proceeding. *See e.g.* 11 U.S.C. §§ 544(b), 547(b) and 548. In addition, the debtor in possession is granted certain administrative powers and, so far as relevant, this includes the power to assume or reject executory contracts. 11 U.S.C. § 365.

Had Parrot Packing Company, as the debtor in possession, chosen to seek rejection of the collective bargaining agreement, the issue of standing would never have arisen for 11 U.S.C. § 365 explicitly authorizes rejection of executory contracts by the "trustee" and by implication authorizes such rejection by the debtor in possession. *See In the Matter of Brada Miller Freight Systems, Inc.*, 702 F.2d 890, 891-2 (11th Cir.1983); 11 U.S.C. § 1107. Here, however, it is not the debtor which seeks rejection but rather the Creditors' Committee through the acquiescence of the debtor in possession which seeks rejection of the collective bargaining agreement. Herein lies the controversy over standing.

Since 11 U.S.C. § 365(a) explicitly authorizes the trustee, and implicitly authorizes the debtor in possession, to reject executory contracts, the question arises as to how such power could conceivably inure to a creditors' committee. Standing, if it is to be found, and is to be granted, must be found in either 11 U.S.C. § 1109(b) or 11 U.S.C. § 105(a). Under 11 U.S.C. § 1109(b), "a party in interest ... including ... a creditors' committee ... may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). Further, 11 U.S.C. § 105(a) allows the bankruptcy court (a function presently being undertaken by this court pursuant to Local Rule 28(c)(2)) to "issue any order, process, or judgment that is necessary or appropriate to carry out this title." 11 U.S.C. § 105(a).

While it may seem to be improper to grant standing on the basis of a general statute where a more specific statute appears to limit standing to a specified group, many courts have authorized creditor committees to bring action despite this apparent conflict. For example, the bankruptcy court in *In the Matter of Monsour Medical Center*, 5 B.R. 715 (Bankr.E.D.Pa.1980), granted the creditors' committee standing to bring suit on a preference pursuant to 11 U.S.C. § 1109(b) even though "[e]xpress authority for a creditors' committee to bring suit is not found in the Bankruptcy Code." *Id.* at 717. Likewise, the bankruptcy court in *In the Matter of Joyanna Holitogs, Inc.*, 21 B.R. 323 (Bankr.S.D.N.Y. 1982), allowed a creditors' committee to bring an action pursuant to 11 U.S.C. § 1109(b) even though "authority for a creditors' committee to bring a suit to recover a transfer voidable is not found in the Code" because "a general right to be heard would be an empty grant unless

those who have such rights are also given the right to do something when those who should will not." *Id.* at 325–326. In similar fashion, the bankruptcy court in *In re Evergreen Valley Products*, 27 B.R. 75 (Bankr.Maine 1983), allowed an action brought by the creditors' committee for a declaratory judgment as to the ownership of property and the validity of prior claims; and the bankruptcy court in *Liberal Market, Inc. v. Malone & Hyde, Inc.*, 14 B.R. 685 (Bankr.S.D.Ohio 1981), authorized the creditors' committee to bring an action to recover property of the estate on the debtor's behalf. *But cf. In Re Segarro*, 14 B.R. 870 (Bankr.P.R.1980) (a result disapproved of by the United States Court of Appeals for the Second Circuit in *Matter of Marin Motor Oil, Inc.*, 689 F.2d 445, 449 (2d Cir. 1982)).

To be sure, the majority of cases referred to in the preceding paragraph were cases where the debtor's alleged refusal to act was premised upon the close relationship between the debtor and the proposed adversary—a problem which is certainly not an issue in this case. Nonetheless, the court is of the view that the principles established in those cases should not be limited to those incidents where the debtor and its adversaries are either insiders or guilty of some misconduct. This is so because the rule appears to be that the "unjustified" refusal to act should be determined from the viewpoint of the creditors and that debtors often have very good reasons for not wanting to pursue all available remedies under the Bankruptcy Code. *See Matter of Allbrand Appliance & Television*, 24 B.R. 125 (Bankr.S.D.N.Y.1982). In this case, the debtor in possession has refused to act out of concern that rejection of the collective bargaining agreement could result in an unfair labor practice charge. That concern in the court's view is real and justified. *See In re Bildisco*, 682 F.2d 72 (3d Cir.1982). The refusal to act has thrust upon the Creditors' Committee additional concern for whatever security it may have in a now failing company. Moreover, it is indisputably clear that the debtor in possession sees the proposed rejection of

the collective bargaining agreement as a necessity for proper reorganization though it does not want to take the initiative. In this sense the debtor in possession has "unjustifiably" refused to act, *Allbrand, supra* at 126 n. 3, and in doing so has forced the Creditors' Committee to act. As such, it appears to this court that maintenance of this action should inure to the Creditors' Committee because of Congress' intention under "section 1109(b) to carry forward an absolute right to be heard on any issue arising in a Chapter XI reorganization," *Matter of Marin Motor Oil, supra* at 453.

In reaching the conclusion that standing on behalf of the Creditors' Committee is appropriate in this case, the court is not unmindful of the union's arguments to the contrary. Particularly worthy of note is the union's argument to the effect that a creditors' committee cannot exercise the "business judgment" required for rejection of an executory contract under 365(a). While that may be true in many cases, it is not true here. In this case, the debtor in possession has exercised that business judgment and agrees that the collective bargaining agreement should be rejected even though Parrot Packing Company, for understandable reasons, refuses to exercise that judgment. Since the debtor in possession has expressed the view that the collective bargaining agreement should be rejected and the Creditors' Committee has merely pursued the same theory, it makes little sense to require the debtor in possession to take that stance when the net result would be the same.

Accordingly, the court is of the view that under 11 U.S.C. § 1109(b), the Creditors' Committee has standing to move for the rejection of the collective bargaining agreement. Further, the court exercises its plenary powers pursuant to 11 U.S.C. § 1103(b) and will entertain such a petition brought by the Creditors' Committee.

*Request for Rejection*

■ Under the Code, the bankruptcy court is empowered to discharge certain

obligations in favor of the debtor so that the debtor can function without unnecessary burdens. Among the dischargeable obligations are executory contracts: "the trustee, subject to the court's approval may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

■ Collective bargaining agreements have been deemed to be executory contracts within the meaning of the Code. *See Shopmens Local No. 455 v. Kevin Steel,* 519 F.2d 698 (2d Cir.1975); *Brotherhood of Railway Clerks v. REA Express,* 523 F.2d 164 (2d Cir.1975). The stated rationale for such a conclusion stems from the nature of a bankruptcy proceeding. "A debtor in possession under Chapter XI ... *is not* the same entity as the pre-bankruptcy company. A new entity is created with its own rights and duties subject to the supervision of the bankruptcy court." *Kevin Steel, supra* at 704 (emphasis in original). Another stated reason for including collective bargaining agreements in the term "executory contracts" derives from the fact that bankruptcy courts, as courts of equity, have wide discretion to assume or reject lingering liabilities. *In re Price Chopper Super Markets, Inc.,* 19 B.R. 462, 465 (Bankr.S.D.Cal.1982). For whatever reason, it is clear beyond peradventure of doubt that collective bargaining agreements are "executory contracts" within the meaning of 11 U.S.C. § 365.

■ Accepting a collective bargaining agreement to be an executory contract within the meaning of the Code, the question then becomes what standard is to be applied in determining whether or not it can, or should, be rejected. As a general rule the test to be applied in rejecting executory contracts is that labelled the "business judgment" test. *In re Marina Enterprises, Inc.,* 14 B.R. 327, 333 (Bankr.S.D. Fla.1981). In *Matter of Minges,* 602 F.2d 38, 43 (2d Cir.1974), the court referred to the business judgment test as one "emphasizing potential greater profit for the debtor's estate and deciding whether to permit or reject a particular contract." Stated

differently, the question is essentially one of determining "what contracts do and do not promote the best interest of the estate." *In re Hurricane Elkhorn Coal Corp.,* 15 B.R. 987, 989 (Bankr.W.D.Ky. 1981). Those executory contracts which burden the estate may be rejected under the business judgment test.

But a collective bargaining agreement is not a "run of the mill" executory contract. This is so because of the "well established federal labor policy, expressed in both statute and judicial decisions, which favor collective bargaining and the specific enforcement of collective bargaining agreements." *In re Price Chopper, supra* at 465; *see e.g. International Association of Machinists v. Central Airlines, Inc.,* 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963). And, the unilateral termination of a collective bargaining agreement may constitute an unfair labor practice. *In re Price Chopper, supra* at 464.

■ Because of the difference between collective bargaining agreements and typical executory contracts, many courts have replaced the business judgment test with a more stringent test. The seminal cases in this respect are the Second Circuit Court of Appeals decisions in *Kevin Steel, supra* and *REA Express, supra.* Those cases accommodate the interests of the workers by holding that rejection of a collective bargaining agreement can only be accomplished by a "thorough scrutiny, and a careful balancing of the equities on both sides." *Kevin Steel, supra* at 707. Still other courts have taken the *Kevin Steel* analysis one step further by requiring that in addition to the balancing of the equities, the bankruptcy court must find that maintenance of the collective bargaining agreement "is so onerous and burdensome, that if enforced, it will lead to the collapse of the debtor's company." *In re Rosow,* 9 B.R. 190, 191 (Bankr.Conn.1981); *see also In re Alan Wood Steel Co.,* 449 F.Supp. 165 (E.D.Pa.1978), *appeal dism.,* 595 F.2d 1211, 1214 (3d Cir.1979).

Notwithstanding the fact that the national labor policy favors collective bargaining

agreements, some courts still follow the "business judgment test" in rejecting collective bargaining agreements. *See In re Reserve Roofing,* 21 B.R. 96 (Bankr.M.D. Fla.1982); *Local Executive Board AFL–CIO v. Hotel Circle, Inc.,* 419 F.Supp. 778 (S.D.Cal.1976). The trend, however, appears to be towards applying a more stringent test such as the one first espoused by the Second Circuit Court of Appeals in *Kevin Steel.*

Given the options, this court like the Third Circuit Court of Appeals in *In re Bildisco, supra,* is "satisfied that *Kevin Steel,* isolated from its illegitimate progeny, provides the appropriate framework for an intelligent and equitable approach to the problem because it gives collective bargaining agreements a measure of protection beyond that available under the business judgment test without unduly advancing the interests served by the Labor Act over the other interests of the employees and those of the debtor's other creditors." 682 F.2d at 81. The *Kevin Steel* analysis has most recently been adopted by the United States Court of Appeals for the Eleventh Circuit in *Brada Miller Freight, supra.*

■ Under *Kevin Steel* and its progeny, "the debtor in possession must first demonstrate that the continuation of the collective bargaining agreement would be burdensome to the estate." *Bildisco, supra* at 81. "[O]nce this threshold determination has been made the debtor in possession must make a factual presentation sufficient to permit the bankruptcy court to weigh the competing equities." *Id.* In weighing the equities, several factors must be taken into account. Such factors include: (1) the possibility of liquidation, both with and without the rejection, and the impact of liquidation on each of the parties involved; (2) the claims that will result from the rejection of a collective bargaining agreement; (3) the cost spreading abilities of the parties; and (4) the good faith of the unions and the debtor in seeking to resolve their mutual dilemma. *Brada Miller, supra* at 899, 900.

■ Balancing the equities in this matter, the court is of the view that rejection of the collective bargaining agreement may be both appropriate and necessary. But, as will be seen, the court is further of the view that if such rejection is to be approved by this court pursuant to 11 U.S.C. § 365(a), such a request must be accompanied by additional concession on behalf of the non-union personnel employed by Parrot Packing. This conclusion rests upon the court's balancing of the equities espoused by the Eleventh Circuit Court of Appeals in *Brada Miller, supra,* separate consideration of which follows.

*A. Possibility of Liquidation*

First to be considered is the "possibility of liquidation both with and without rejection and the impact of litigation on each of the parties involved." *Brada Miller,* 702 F.2d at 899. In this case it is clear that without rejection of the contract liquidation is a very real and immediate possibility given Fort Wayne National Bank's stated intention to seek liquidation. Unless something happens to aid in restoring the equity cushion between now and August 5, 1983, there is a very real possibility that Parrot Packing will be out of business on that date. Whether or not liquidation might occur even if the contract is rejected is difficult to ascertain but it appears to the court that absent rejection of the collective bargaining agreement and other reductions, liquidation is an all but foregone certainty.

Rejection of the collective bargaining agreement should result of savings of $10,000 per month, and that savings, at least during these peak summer months, should be enough to allow Parrot Packing Company to turn a profit, or at least not encroach any further into the equity cushion. Though such a turn for the better may be only for a short period of time, that may be enough time to allow Parrot Packing Company to find investors or a buyer. Moreover, it seems clear that no party would benefit by liquidation of the debtor except, perhaps, the bank which could recover its

collateral. Unsecured creditors would be denied any recovery based on the going concern value of the debtor. Shareholders would lose their investment entirely. Union and non-union employees would lose their jobs. Any resulting claims that may be filed in the bankruptcy court by the union members would be small compensation for the loss of a job.

In determining that rejection of the collective bargaining agreement may be in order, the court is not unmindful of the fact that the union employees may choose to strike, *Brada Miller, supra* at 899 (though it is hoped that a strike will not occur), and that such a strike may effectively lead to the demise of Parrot Packing. Nonetheless, that is but a mere possibility while liquidation of Parrot Packing Company absent rejection of the collective bargaining agreement and further reductions appears to be a real probability.

## B. Resulting Claims

The second factor to be taken into account in balancing the equities is closely related to the first and requires the court to "consider the claims that will result from the rejection of a collective bargaining agreement, both in terms of the adequacy of relief for the employees and other claimants, and the impact of these claims on the debtor." *Brada Miller, supra* at 900. "In considering ... this factor ... the court may find it appropriate to treat employees covered by the collective bargaining agreement and non-covered employees as distinct groups, paying particular attention to the proportion of covered employees in the entire work force of the bankrupt company." *Id.*

At Parrot Packing Company, union members outnumber noncovered employees forty-three to twenty-two. In this respect it is clear that many potential claims will result from the termination of the collective bargaining agreement.

Since most of the tangible losses. can form the basis of a claim for money damages when a collective bargaining agreement is rejected, the principal concern in balancing the equity goes to intangible claims which "are non-monetary and generally incapable of providing a basis for a damage award." *Brada Miller, supra* at 900. "These types of intangible non-compensable benefits may include pension rights, welfare rights, seniority rights, scope of work, union shop check off and discharges, disciplinary grievance/arbitration procedures, meal periods, jury duty, and uniforms." *Id.* at n. 31.

Here, a review of the collective bargaining agreement between Parrot Packing Company and Local 280 indicates that the rejection of the agreement could lead to a loss of many intangible benefits. While that is a possibility, it is not altogether certain. Many of these fringe benefits may remain intact. Parrot Packing Company has recognized its duty and has indicated its willingness to bargain with the union should the agreement be rejected. Thus, how this factor weighs in the balancing of the equities is impossible to determine at this time. Good faith negotiations on the part of all parties concerned could result in the minimalization of these types of losses.

## C. Cost Spreading Abilities

A third factor to be considered under the *Kevin Steel* approach is the cost spreading abilities of the parties. "Certainly, a $50,-000 loss to a group of employees averaging $20,000 a year in salary may have a far more devastating impact than a $100,000 loss suffered by a group of large banks and other major creditors or by the debtor employer itself." *Brada Miller, supra* at 900. Distributing some of the costs of Parrot Packing Company to the major secured creditor is all but impossible given the Fort Wayne National Bank's position that it will not compromise its claim. That position seems justified given the fact that the bank could sustain substantial losses if nothing is done to rectify the present situation of Parrot Packing.

Being unable to spread the cost to the major secured creditor, whatever distribution is to be accomplished must be done at

the company itself. Since the filing of the petition, many reductions have been undertaken by the company. Among other things, leases have been rejected; managers have taken salary cuts; non-union members have been terminated; and others have assumed additional responsibility without any increase in compensation. The union for its part has been exemplary in its concessions. But none of this has been enough to save the Parrot Packing Company.

To be sure, rejection of the collective bargaining agreement would be a substantial savings for the company. The court is compelled to note, however, that other potential savings appear possible.

There are many managerial personnel vis-a-vis the number of employees to manage. Despite the fact that the number of managers and supervisors has dropped since October of 1982, the number of supervisors per union employees has proportionately risen because of the fact that a proportionally greater amount of union employees have been laid off. Whether or not the ranks of the non-bargaining unit can be further diminished is not entirely clear. What is clear, however, is the fact that the vast majority of non-union employees are receiving more today, in terms of average monthly compensation, than they did in October of 1982 while, at the same time, those covered by the collective bargaining agreement have suffered substantial pay cuts. It is now proposed that the union employees be subjected to further reductions through rejection of the collective bargaining agreement. This, in the court's view, is entirely inequitable in terms of the cost spreading abilities of the parties.

The court sees no reason why those not covered by the collective bargaining agreement should not receive substantially similar, if not the same, reductions in total compensation as those suffered by the union employees. It is highly inequitable that efforts to cut costs in terms of pay reductions should fall almost entirely upon the union. True, managerial employees have taken a recent reduction in total compensa-

tion, but that reduction is not comparable to that taken by the union employees particularly when one considers the further reductions which will result from a rejection of the collective bargaining agreement. Since the company believes that rejection of the collective bargaining agreement could result in profits for certain months, corresponding reductions in non-union employees' compensation could only aid in the recovery of Parrot and expedite the same.

Balancing the equities in terms of cost spreading abilities, the court is of the view that while rejection of the collective bargaining agreement may be appropriate, that rejection should only be approved if it is accompanied by further reductions in the total compensation paid to non-union employees. It is simply inequitable to force one group of employees to sustain a vastly disproportionate share of reductions when others could share in that burden for the common good of Parrot Packing Company.

### D. Good Faith

The fourth and final factor to be considered in balancing the equities is "the good (or bad) faith of the union and the debtor in seeking to resolve the mutual dilemma ..." *Brada Miller, supra* at 900. In making this evaluation the court should consider whether or not the employer sought concessions prior to its attempt to reject the contract; whether there has been cooperation in the past; and whether or not future negotiations would be successful. *Id.*

In this case, the record reflects nothing but good faith on the part of the interested parties. The company has bargained with the union in good faith, and has fully disclosed financial information to the union so that the union would be apprised of the Parrot Packing Company's financial position. Further, at the time of the filing of the Chapter XI petition, Parrot Packing Company attempted to assume the collective bargaining agreement and when the official Creditors' Committee objected, Par-

rot Packing Company sought to reopen negotiations with the union. That the debtor is acting in good faith is further borne out by the fact that it has been exceptionally hesitant to use the rejection process under 11 U.S.C. § 365. Given the above, the court must conclude that the parties have been acting in good faith. The court must further conclude that any attempts to renegotiate the collective bargaining agreement will be futile. Court approved rejection of the collective bargaining agreement appears to be the only solution.

### Conclusion

On the basis of the foregoing, the court finds that the Creditors' Committee has standing to seek rejection of the collective bargaining agreement between Local 280, United Food and Commercial Workers International Union, AFL–CIO and the debtor in possession, Parrot Packing Company. Accordingly, the official Creditors' Committee's alternative prayer for relief which requests that it be authorized to proceed on the debtor's behalf to seek rejection of the contract will be GRANTED. Prior to approval of a request to reject the collective bargaining agreement, however, the Creditors' Committee must make a showing to the court that the equitable concerns set forth above, and in particular those concerns set forth in subsection C, have been addressed by the debtor in possession. Specifically, the debtor in possession must show that the average monthly compensation received by non-union employees will be reduced by the same percentage as the average monthly compensation of union members after the rejection of the collective bargaining agreement so that all employees at Parrot Packing Company—union and non-union alike—will receive the same reduction, in terms of relative percentages, between the average monthly compensation they received on October 10, 1982 and that which the union members will receive after a rejection of the collective bargaining agreement.