In re **MARINA ENTERPRISES, INC., Debtor.**

Bankruptcy No. 81–00119–BKC–JAG.

United States Bankruptcy Court, S. D. Florida.

Aug. 14, 1981.

Gregory C. Hartman, Miami, Fla., and Avery Cohen, Guren, Merritt, Sogg & Cohen, Cleveland, Ohio, Stanley Weiss, Carpenter, Bennett & Morrissey, Newark, N. J., for Casino.

Philip Bloom, Miami, Fla., and Michael V. Blumenthal, Finley, Kumble, Wagner, Heine & Underberg, New York City, for Marina.

ORDER ON MOTION TO DISMISS/OR TRANSFER VENUE AND ON APPLICATION FOR REJECTION OF LEASE

JOSEPH A. GASSEN, Bankruptcy Judge.

This chapter 11 proceeding was filed on January 28, 1981 by Marina Enterprises,

Inc. (Marina). The immediate precipitating cause was the obtaining on January 27, 1981 of a partial summary judgment of foreclosure by Hotel Associates of Atlantic City of a purchase money mortgage it held on the only substantial asset of the debtor, a parcel of unimproved property containing slightly less than 8.5 acres in Atlantic City, New Jersey and zoned for hotel-casino development (hereinafter referred to as "the subject property"). The automatic stay invoked upon the filing of the chapter 11 petition (11 U.S.C. § 362) stopped any foreclosure sale or other post-judgment relief in that foreclosure action. Hotel Associates of Atlantic City has not only not requested that the stay be modified to permit it to proceed but rather has stipulated that it will not seek such relief from stay and supports the debtor in the positions taken by Marina as debtor-in-possession on the issues dealt with in this opinion.

The subject property was acquired by the debtor from Hotel Associates of Atlantic City (HAAC) in May, 1979 pursuant to a contract in that regard made in April, 1979. (Casino's Exhibit D). A purchase money mortgage from Marina to HAAC was a substantial part of the consideration for that conveyance. That sale was subject to a lease that was in existence between HAAC as lessor and Casino by the Sea Corporation (Casino) as lessee which was executed June 20, 1978 and amended on September 30, 1978 (Joint Composite Exhibit No. 1). Article 1 of that lease provides that the lessor will erect on the subject property an eighteen story building to be used "solely and exclusively as a Hotel and Casino." It further provides in Article 2 that the "term of this lease shall commence at such time as the Building shall have been substantially completed." It is not disputed that not only was the building never completed, but it is agreed by all parties that it was never even commenced.

The first matter of significance brought before the court by Marina as debtor-in-possession in this case was its application on April 24, 1981 for order rejecting and disaffirming the lease on the subject property between Marina (the owner, as a result of its acquisition from HAAC) as lessor and Casino as lessee. (C.P. No. 17a). This application was originally set for hearing on June 2, 1981 but as a result of stipulated continuances, it was last scheduled and subsequently heard on July 8 and 9, 1981. On June 16, 1981, Casino filed its answer to Marina's application for order rejecting and disaffirming lease (C.P. No. 32) and on June 24, 1981, filed its motion to dismiss chapter 11 proceedings or in the alternative to transfer venue (C.P. No. 37). The affidavit of Howard Levin, president of Casino, in support of that motion had previously been filed on June 16, 1981 (C.P. No. 31). By reason of notice requirements under the rules, the hearing on the motion to dismiss or transfer venue was scheduled for July 30, 1981.

Casino moved that the hearing on Marina's application for rejection of lease be continued from the July 8, 1981 scheduled hearing date to July 30, 1981 to coincide with the hearing on the motion to dismiss. Following a hearing on the motion for continuance, the court entered its order on July 1, 1981 denying that motion (C.P. No. 51) and further provided in that order that the parties be prepared to argue the motion to dismiss or transfer venue at the July 8th hearing even though the court stated and the parties understood that the motion to dismiss or transfer venue could not be determined until all interested parties had an opportunity to participate in the hearing that remained scheduled on that motion for July 30, 1981.

Extensive memoranda were filed by the parties prior to the July 8th hearing and that hearing was held on July 8th (transcript is C.P. No. 67) and 9th (transcript is C.P. No. 68) at which time extensive evidence was taken and arguments heard with respect to the rejection of lease and dismissal or transfer issues.

Following that hearing, the parties submitted additional comprehensive briefs which have been of great aid to the court in this matter. The hearing on dismissal or transfer scheduled for July 30, 1981 was

held that date and additional evidence and argument were presented by the parties (transcript is C.P. No. 99). No additional parties filed any pleadings or made any appearance at the July 30th hearing. The debtor had previously filed or caused to be filed affidavits of all other creditors in opposition to Casino's motion for transfer of venue (C.P. Nos. 57–63).

The evidence on the issues of jurisdiction (dismissal), venue and rejection of the lease is to a large extent interchangeable and overlapping. The court considered all of the evidence presented on July 8th, 9th and 30th (C.P. Nos. 67, 68 and 99 and the exhibits admitted into evidence at those hearings) on all of the issues.

First we address the issues raised by Casino's motion to dismiss or in the alternative to transfer venue. If the matter is dismissed, then all other issues become moot. If venue is transferred to the Bankruptcy Court for the district of New Jersey in which Atlantic City is located, then the application for rejection of lease should be considered by that Bankruptcy Court.

The thrust of Casino's position as to dismissal is that Marina is a mere shell which is owned and controlled ultimately by Cavanagh Communities Corporation (CCC) through a controlled subsidiary of CCC (Royale International Corporation of New Jersey); that the debtor has no business or going concern values or other assets to preserve for the interest of claimants; that CCC is utilizing the processes of this court and the provisions of the Bankruptcy Code for an improper purpose; and that there is no reasonable likelihood that the debtor can effectuate a plan of reorganization. Able and resourceful counsel for Casino have urged every fact and legal point that might avail it on its dismissal request. However, none of the voluminous evidence admitted by way of documentary exhibits and testimony establishes that there was anything illegal or improper in the conduct of the debtor or its affiliates regarding the formation of the debtor-corporation, the acquiring of title to the subject property or the bringing of these proceedings. Only Marina is a debtor in this case and regardless of the disposition of any claims which any creditor may have against Marina, those creditors are not precluded from pursuing any claims they may have against parties other than the debtor herein (such as HAAC, CCC or other individuals and corporations which may be liable to Casino for damages resulting from any alleged and established misconduct such as breach of contract or otherwise.)

Marina was formed prior to its acquisition of the subject property which occurred in the spring of 1979. The closing of the purchase of the subject property from HAAC by Marina was in May, 1979 pursuant to the agreement for the purchase and sale of that real estate dated April 5, 1979 (Casino's Exhibit D). Between the time the contract of purchase was entered into and the closing, CCC entered into an agreement with Casino to acquire Casino's lessee's interest in Joint Composite Exhibit No. 1. The agreement between CCC and Casino was made on April 30, 1979 and is in evidence as Debtor's Exhibit No. 3. Concomitant with that agreement and of even date, there was a letter of understanding between Casino and Marina (Casino's Exhibit C). CCC was funding Marina's purchase of the subject property from HAAC through a series of stock transactions by which CCC through another subsidiary gained ultimate control of Marina. As aforesaid, Marina closed on its acquisition of the subject property with HAAC but CCC never acquired Casino's leasehold interest in that property pursuant to Debtor's Exhibit No. 3, ultimately, because it was unable to complete the financing of that acquisition.[1] Therefore, whether CCC intended to merge the fee owned by Marina and the lease being acquired by it is moot by reason of the failure to consummate the acquisition of the lease. There is nothing in law or experience to suggest that a merger of fee and leasehold was inevitable since frequently, affiliated corporations choose to have title in one entity and leasehold interest in another.

1. Or because, as suggested by Casino, the whole project could not be financed.

Marina filed this bankruptcy case only after HAAC had obtained a partial summary judgment in its foreclosure action in January, 1981 and it submitted its asset (the fee interest in the subject property) to the jurisdiction of this court. The property had not been transferred to Marina by any of its affiliated corporations for the purpose of this bankruptcy. Casino introduced a deed of bargain and sale (quitclaim deed) from Royale International Corp. of New Jersey to Marina regarding the subject property executed and recorded just a few days prior to the summary judgment in the foreclosure action and the filing of the petition in this proceeding (Casino's Exhibit G). There is no evidence that Royale International Corp. of New Jersey ever held title to the subject parcel and Casino does not contend that it did. It asks the court to infer a nefarious purpose to that deed by its mere execution and recording. Technically it appears to be nothing more than a wild quitclaim deed. However, the court can speculate that there was some basis for its execution and recording since Royale was party to a transaction involving the eight acres which had originally been part of a total tract of more than sixteen acres owned by HAAC, which total tract was the subject of the original lease between HAAC and Casino on June 20, 1978. A portion of that total tract was removed from the lease between HAAC and Casino through the amendment to that original lease made in September, 1978. It is entirely possible that the quitclaim deed was executed and recorded to clarify any confusion that might have existed in the state of record title to the parcel retained by HAAC and transferred to Marina. Such a clarification of title could only redound to the benefit of not only Marina but also HAAC and Casino and, as far as appears of record in this case, did not serve to add any new assets to the capital structure of Marina.[2]

It is true that the debtor has no business or going concern value. However, it does have its equity in the subject property on which a successful reorganization might be predicated. The court cannot prejudge whether or not a successful and confirmable plan of reorganization will be submitted. The issue of equity in its asset will be explored more fully below when the issue of rejection of the lease is considered.

■ Casino asserts that Marina's utilization of the bankruptcy process and particularly the effort to reject the lease which Casino holds on the subject parcel is an improper use of the bankruptcy process. It argues that since Marina was undercapitalized and was unable to obtain financing for the construction of the hotel-casino under the lease, it should not be rewarded by permitting it to use the bankruptcy court for the primary purpose of cancelling the lease. The experience of this court is that most of the business debtors which come to it do so as a result of undercapitalization and poor business judgment in the past. It is precisely for these reasons that Congress has adopted a Bankruptcy Code which gives a business debtor a second chance through the chapter 11 process. This process includes the right to reject executory contracts such as the debtor is seeking here. We therefore hold that this chapter 11 case should not be dismissed for any of the reasons suggested and urged by Casino or for any other reason known to the court or indicated by the evidence. Certainly Casino has not established any of the specific bases enumerated in 11 U.S.C. § 1112(b) nor is the court convinced that Casino has demonstrated that the equitable inferences under general bankruptcy jurisdiction or as codified in 11 U.S.C. § 305 should be invoked to grant dismissal or abstention.

■ Having concluded that Casino's motion to dismiss this proceeding is not well taken and should be denied, we next ad-

---

2. Counsel for Casino speculated that HAAC may have originally deeded 90.2% of the subject parcel to Marina and 9.8% to CCC. He stated without offering evidence that contemporaneously with the execution and filing of Casino's Exhibit G, CCC deeded the 9.8% to Royale International (C.P. 99, p. 16). In any event, fee title was clarified or cured in Marina on the basis all parties had relied upon as expressed in the documents of April, 1979. (Casino's Exhibits C and D, Debtor's Exhibit No. 3).

dress the issue of its alternative motion to transfer venue to New Jersey. Casino argues that Marina is a New Jersey corporation and its sole asset (fee title to the subject property) and therefore "business" is in Atlantic City, New Jersey. It is also a fact that the president of Marina, John Sgarlat, resides geographically closer to Atlantic City (Philadelphia, Pennsylvania) than to the southern district of Florida. CCC together with its subsidiaries including Marina has its corporate office and headquarters in Hallandale, in the southern district of Florida. 28 U.S.C. § 1472 gives the debtor its choice of commencing its chapter 11 case in the domicile, residence, principal place of business in the United States, or location of principal assets in the United States of the entity subject to the chapter 11 proceeding. Marina is domiciled in New Jersey and its principal assets are also there. Therefore, the issue is whether or not its "residence" or its principal place of "business" is in the southern district of Florida. The evidence reveals that the only office that Marina maintains is with its parent CCC in Hallandale, Florida. Its mailing address is there and its books and records (such as they are) are also in the Hallandale office. It has no telephone listing in Hallandale (and apparently none elsewhere) and probably does not need such a listing since it is not engaged in any business activity directed to telephone subscribers in south Florida. Its "business" is conducted either out of the Hallandale office or by Mr. Sgarlat in his Philadelphia, Pennsylvania office or through its lawyers in Miami, Florida, New Jersey and New York. Its "business" to date has been the acquisition of the fee title to the subject property, its efforts to finance the lessor's obligation to construct the improvements, its defense of the foreclosure action in New Jersey and its role as one of the plaintiffs in an action against Casino and others in the New Jersey courts. Its efforts to obtain financing have been primarily outside of the district in New Jersey in which the subject property is located. It is undisputed that the subject property is a dormant, unimproved parcel of real estate in Atlantic City on which there is no present activity nor has there been any activity in and upon the real estate per se at any time pertinent hereto. Therefore, we find that Marina "resides" in the office it shares with its parent CCC in Hallandale, Florida and conducts at least some of its business from that office. We conclude that there is no reason why the debtor is precluded from choosing the southern district of Florida as the venue of its chapter 11 case under the facts as outlined above. Therefore, the motion of Casino to dismiss or, in the alternative, to transfer venue is denied in both particulars.

We now turn our attention to the substantive issue of whether or not Marina as debtor-in-possession should be allowed to reject and cancel the lease between it as lessor (by purchase of the fee from HAAC) and Casino as lessee. 11 U.S.C. § 365 clearly provides the authority under which a trustee, subject to the court's approval and the assessment of such damages as may pertain, may assume or reject any executory contract or unexpired lease of the debtor. A debtor-in-possession has all the powers of a trustee by virtue of 11 U.S.C. § 1107(a). The only question therefore is whether or not the court's approval ought to be withheld under the facts and circumstances of this case.

The initial term of the lease is for thirty-one years commencing at such time as the hotel-casino is substantially completed. Thereafter, the lessee has the option for three consecutive ten-year renewals making the total possible term of the lease sixty-one years. The amendment to the lease executed September 30, 1978 (part of Joint Composite Exhibit No. 1) among other things did the following: reduced the size of the parcel originally under lease from over sixteen acres to the 8.457 acres of the subject parcel (Casino was paid $2,000,000 for releasing the other portion of the premises and HAAC the then owner sold the released parcel to another entity); raised the amount of the construction financing from $19,000,000 to $23,000,000 and set the total cost of the building at approximately $34,000,000; provided for costs in excess of

$34,000,000, to be supplied by the lessor up to an additional $2,600,000 and by Casino as to further funds as necessary; raised the base rent from $4,000,000 to $5,000,000 per year after the first year. (There is also additional rent in the form of a percentage of certain gross revenues).[3]

The witnesses for all of the parties agreed that the hotel casino could not now be built for $34,000,000 because of inflation and increased requirements of the New Jersey gaming commission. The debtor's witnesses testified that the present cost of construction would be at least $97,000,000. Casino's expert securities analyst on the gaming industry said it would now take $150,000,000 (testimony of C. James Walker, C.P. No. 99, p. 63).

There is no dispute that Marina was unable to obtain construction financing and that the building was never commenced. Casino contends that Marina will never be able to get financing because of its financial and corporate structure, particularly with respect to its affiliation with CCC. Marina, on the other hand, says that the basis for its inability to get financing is the improvident lease with Casino[4] and Casino's lack of the financial ability or previous experience necessary to operate a hotel-casino.

Casino has been trying to develop plans for utilizing the property for something other than a hotel-casino. Marina does not agree to this change of permitted use. Several witnesses including the expert witnesses testified that hotel-casino use was the highest and best use for this property.

There is no evidence that the parcel is worth in excess of $10,000,000 (the amount needed to satisfy the first mortgage) with the lease in existence.

John Sgarlat, president of Marina, thinks it would be worth as much as $24,000,000 without the lease. Other witnesses includ-

ing the experts were less optimistic putting the value without the lease from a low of approximately $8,000,000 in the opinion of the expert Frank A. Schlesinger, to $20,000,000 as testified to by the expert Lester Salzman. (C.P. No. 99, pp. 87, 109). Even Howard Levin, president of Casino, said that the value of the parcel might be as high as $14,000,000 (C.P. No. 69, p. 341). The court therefore finds that the value of the parcel without the lease is at least $15,000,000 and there is reason to anticipate that it may be worth even more than that without the lease. Therefore, there can be no realistic anticipation of successful reorganization or rehabilitation without rejection of the lease.

■ Marina, by way of argument, has essentially relied upon the proposition that it is entitled to exercise its business judgment in seeking to reject this unexpired lease. There is no doubt that the business judgment test has been enunciated as a basis for rejection under § 365 in decisions of appellate courts which we find to be persuasive and controlling. *In re Jackson Brewing Co.*, 567 F.2d 618 (5th Cir. 1978); *In re Minges*, 602 F.2d 38 (2d Cir. 1979). Also see *In re High Fliers, Ltd.*, 7 B.C.D. 747 (S.D.Cal.1981). There is no doubt in the court's mind that under the facts in this case the debtor-in-possession is entitled to reject the subject lease in the exercise of its business judgment.

■ If, however, the burdensomeness test were the applicable one to apply to the right to reject the lease, debtor-in-possession would still prevail. The subject lease is burdensome to the point of rendering it virtually impossible from a practical point of view for the lessor to comply with the lease. No creditors other than HAAC could be paid anything without rejection. The debtor has no equity in the property with the lease in place. Even if this were a

---

3. The lease also gives the lessee the right to make mortgage payments on behalf of the lessor. (Joint Composite Exhibit No. 1 at page 47). Obviously the lessee did not exercise this right, or otherwise the purchase money mortgage would not now be in foreclosure.

4. Even under optimum conditions, the rent will probably not cover debt service, much less give a realistic return on investment.

proceeding under chapter 7 of the Bankruptcy Code, the trustee would have the right to seek rejection of this lease in order to maximize the benefits to the estate from the subject property.

■ Casino's fallback position is that even if the court reaches the conclusions that it has as above set forth, its right to possession remains unimpaired under 11 U.S.C. § 365(h)(1). The court disagrees. The phrase "may remain in possession" contained in that section implies continuation of existing possession on the part of the lessee. We specifically find that there has been no such possession of the subject property by Casino in this case.

The property is vacant and unimproved. There has been no physical use made of it at any time since the original lease was made on June 20, 1978. There has been no rent paid nor has Casino as lessee made any mortgage payment or tax payment as it was permitted to do under the lease. As a matter of fact, the lease requires that Casino as tenant pay the taxes after the commencement of the term. The term commences upon substantial completion of the building contemplated by the lease. (Joint Composite Exhibit No. 1, Article 5, p. 5).

The very fact that Casino had no obligation to make any of these payments until the term commenced under the provisions of the lease suggests it was not in the kind of possession which would give it any rights under § 365(h)(1). While the court recognizes the principle of constructive possession of unimproved real estate, we do not find that Casino had such constructive possession here. The lessor had to have physical possession of the property in order to construct the improvement which was its obligation to do under the lease. Further, it is not unusual for a lease to be entered into on one date with the occupancy and rent to begin on a date in the future. Business entities and individuals must plan in advance for their real estate needs and there is obviously no right to use and occupy a premise until the commencement of the term and the obligation to pay rent matures. The April 30, 1979 letter (Casino's Exhibit C) which Marina obtained from Casino prior to Marina's closing title acquisition with HAAC provided in part that Marina be permitted to go upon the premises for certain inspection, testing and other pre-closing purposes. This request by (perhaps overly) cautious lawyers for Marina does not amount to a recognition by Marina in this proceeding that Casino had possession of the premises within the meaning of § 365(h)(1). Therefore, the accomplishment of Marina's perceived need to reject the lease cannot be frustrated by Casino under § 365(h)(1).

■ This, however, does not leave Casino without any rights or remedies. The rejection of a lease constitutes a breach of the lease and the aggrieved party (Casino) is entitled to its damages by reason of such breach. 11 U.S.C. § 365(g).

Pursuant to the foregoing, it is

ORDERED as follows:

1. The motion of Casino to dismiss this chapter 11 case is denied.

2. The alternative motion of Casino to transfer venue of this case to the District of New Jersey is denied.

3. The application of Marina for order rejecting and disaffirming the lease is approved and granted. The lease as amended between Marina as lessor (by acquisition of fee from HAAC) and Casino as lessee (Joint Composite Exhibit No. 1) is deemed disaffirmed and rejected and the parties to the lease have no further obligations under it. This disaffirmance and rejection constitutes a permitted breach of the lease under § 365 of the Bankruptcy Code. Casino is not precluded by this order from seeking its damages, if any, resulting from such breach.