## In re HURRICANE ELKHORN COAL CORP. II, Debtor.

### Bankruptcy No. 38100203.

United States Bankruptcy Court, W. D. Kentucky.

Dec. 22, 1981.

Gary J. Sergent and Robert E. Ruberg, O'Hara, Ruberg, Osborne & Taylor, Covington, Ky., for Cincinnati Gas & Elec. Co.

John P. Reisz, Reisz, Rice, Porter & Rosenbaum, Louisville, Ky., for debtor-in-possession.

James W. Halloran, Cors, Hair & Hartsock, Cincinnati, Ohio, James G. Apple, Louisville, Ky., for Logan and Kanawha.

### ORDER

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

The debtor-in-possession, Hurricane Elkhorn Coal Corporation II, has made application for authority to reject a coal supply agreement with the Cincinnati Gas and Electric Company (GC&E) and Logan and Kanawha Coal Company, Inc. CG&E has objected to the application.

An evidentiary hearing was held on October 19, 1981, at which testimony was given by Roy Gleason, manager of energy supply for CG&E, and Charles F. Schwab, president of Hurricane Elkhorn.

The coal supply agreement provided that during the ten-year period from 1979 to 1989, Hurricane Elkhorn would ship CG&E 1.8 million tons of coal at a base price of $29.50 per ton. The agreement further provided that the base price would be adjusted to reflect changes in various components related to the cost of production and changes in government indices for consumer prices and producer prices.

Gleason testified that in order for CG&E to adjust the base price of $29.50 per ton, Hurricane Elkhorn had to supply figures reflecting the increase, if any, in its cost of production. Hurricane Elkhorn did not supply those figures, and because the price could not be escalated until the base figures were evaluated by CG&E, escalation was deemed waived.

Gleason also testified on the importance to CG&E and its customers that the contract be performed. Since June of 1979 Hurricane Elkhorn has shipped 270,000 tons of coal to CG&E. To fulfill the terms of the contract, Hurricane must ship an additional 1,530,000 tons by 1989. If the contract is rejected, CG&E may be forced to

pay as much as $36 per ton for replacement coal, resulting in a projected loss over the remaining years of the contract of $9 million. The loss would be passed directly to CG&E's 1.4 million customers.

In addition to the direct pecuniary effect on CG&E's customers, rejection of the contract could, Gleason said, result in the need for extensive modification to the particular power plant to which the coal would have been shipped. Hurricane Elkhorn supplies low-sulfur coal. The Environmental Protection Agency permits the power plant to burn only low-sulfur coal, and requires that CG&E have a long-term contract for the supply of low-sulfur coal. If suitable coal is not used, the plant would be forced to shut down or have "scrubbers" installed to filter the waste caused by burning coal of higher sulfur content. It would cost $61 million to install the scrubbers in the plant, with an additional cost of $1 million for the acquisition of land needed for the treatment of high-sulfur coal waste.

Further, "compliance coal" can be obtained only on a limited basis, and the prospects for executing a long-term contract for the purchase of such coal are uncertain.

To meet its needs, CG&E is now buying coal on the spot market for $33 per ton. It presently has other long-term coal supply agreements to buy coal at a base price of $36 to $41 per ton. If Hurricane Elkhorn resumed shipments, its coal would represent approximately one-fifth of the total plant requirement, amounting to 15 of the 70 tons needed monthly to operate the plant.

Rejection of the contract could be damaging to CG&E, but its continued performance would be fatal to Hurricane Elkhorn. From the outset, the contract has resulted in a loss to Hurricane Elkhorn. An anticipated increase in production that would have made the contract profitable never materialized. The base contract rate for the coal was $29.50 per ton. After deducting a 4% agent's commission, the net selling price was reduced to $28.30 per ton. The actual production cost, however, was $28.75 per ton, resulting in a net loss to Hurricane Elkhorn of $.45 per ton.

Because production costs exceeded the net selling price from the beginning, any subsequent adjustment to the base price to reflect an increase in production cost could never be sufficient to yield a profit for Hurricane-Elkhorn. To crudely illustrate the problem, if production cost (not accounting for other cost components) increased from $28.75 to $29.75, the base price of $29.50 would be raised to $30.50. Although the base price would float upward to meet the increase in the cost of production, the resulting net loss would remain unchanged.

The only way that Hurricane Elkhorn could profit under the agreement is if the indices components, the Consumer Price Index and Producer Price Index, escalated at a higher rate than cost components. Because any increase in the base price results from the combined effect of an increase in actual cost components and an increase in the applicable indices, it is possible that the indices increase could outstrip a cost components increase so as to overcome an initial net loss.

That has not occurred yet, however, and there is no evidence that it is likely to happen in the future. Nor is it apparent that if such an increase in indices did occur, the increase would hold steady throughout the remaining term of the contract so as to consistently produce a profit.

Further, even if the indices surged, Hurricane Elkhorn would still be straddled with expenses that are *not* included as cost components for purposes of adjusting the base price. For instance, interest expense, a necessary consequence of a beleaguered company's need for new capital, was at one time running as high as $10 per ton. Over time, interest expense will probably average $5 to $6 per ton at present rates.

The facts and figures produced by Hurricane Elkhorn regarding production and other costs and the selling price under the contract with CG&E lead to an inescapable conclusion:

If forced to perform under the agreement, Hurricane Elkhorn would sustain a

continuing loss over the next eight years. The prospect of that loss, when considered with the fact that one-third of Hurricane Elkhorn's total production capacity would be committed to service the agreement, makes it necessary for this court to grant the relief sought by the debtor-in-possession.

So obvious is the hardship that continued performance would pose to the debtor-in-possession, rejection could be permitted under either of the two standards presently employed in determining whether a contract may be rejected. The "onerous and burdensome" standard allows rejection only when, as here, an estate will suffer an actual loss under a contract.[1] The "business judgment" standard,[2] as its appellation connotes, is less rigid and permits a greater exercise of business discretion than the "onerous and burdensome" standard. It is with an eye toward application of the business judgment test that we note that Hurricane Elkhorn can presently fetch $36 per ton on the spot market and possibly $40 through a long-term agreement.[3] Selling at such prices would substantially enhance Hurricane Elkhorn's prospects for a successful reorganization.

In making our determination we are not unmindful of the problems that rejection might pose to CG&E. We feel compelled, therefore, to address finally some of CG&E principal arguments.

In its brief, Cincinnati Gas & Electric urges that the contract could be profitable if Hurricane Elkhorn submitted the cost components needed to adjust the base price. As we have noted, however, the base price was too low to be profitable from the start, so any increase to allow for increased production cost would merely prevent the loss from growing. It would never result in a profit.

We also have doubts about the grim scenario CG&E outlined for its power plant if the plant does not receive a steady supply of low sulfur coal from Hurricane Elkhorn. Although the possibility was discussed of CG&E not being able to secure substitute low sulfur coal and of the dire consequences that might follow, the likelihood or immediacy of such an occurence was never explored. By contrast, it is readily apparent that forcing the debtor-in-possession to perform this contract would have a debilitating effect on its reorganization prospects.

Finally, we note that CG&E's draconian forecast of a $9 million long-term additional cost to its customers, if the contract is rejected, is not as bad as it sounds. That increase, spread among CG&E's 1.4 million customers, results in an increase to each customer, over an eight-year period, of only about six dollars, or less than a dollar a year.

We conclude with the hope, if not the prediction, that once Hurricane Elkhorn is freed of the burden of its present agreement with CG&E, these parties might begin negotiating toward a new one.

Upon the foregoing reasoning and authorities,

IT IS HEREBY ORDERED that Hurricane Elkhorn Corporation II's Application for Authority to Reject the Coal Supply Agreement between it and the Cincinnati Gas and Electric Company and Logan and Kanawha Coal Company, Inc., be and is approved.

The foregoing shall constitute findings of fact and conclusions of law.

---

1. *In re Vidicom Systems, Inc.*, 2 BCD 2 (S.D.N.Y.1975).

2. *In re Minges*, 602 F.2d 38 (2nd Cir. 1979).

3. See e.g. *In re J. H. Land & Cattle Company, Inc.*, 8 B.R. 237 (Bkrtcy.W.D.Ok.1981), in which rejection was allowed solely because a more lucrative contract could be obtained. We draw no conclusions, because this case does not necessitate we do so, as to whether the availability of a more lucrative contract than the one sought to be rejected may by itself constitute sufficient ground for rejection.