### In re PESCE BAKING CO., INC., Debtor.

**Bankruptcy No. B84–323–Y.**

United States Bankruptcy Court,
N.D. Ohio.

Nov. 14, 1984.

---

Daniel P. Thomas, Warren, Ohio, for debtor.

Anthony P. Sgambati, II, Youngstown, Ohio, for Teamsters.

Richard Ross, Cleveland, Ohio, Kirk R. McKenzie, Seattle, Wash., for Bakers.

## FINDING AS TO REJECTION OF CONTRACTS

H.F. WHITE, Bankruptcy Judge.

This matter is before the court on the application of the debtor and debtor-in-possession, Pesce Baking Company, Inc., ("debtor") to reject, pursuant to 11 U.S.C. section 365(a), three executory contracts. The executory contracts sought to be rejected are collective bargaining agreements subject to the National Labor Relations Act (NLRA), 29 U.S.C. section 151 et seq. The three non-debtor parties to the collective bargaining agreements are: Bakers Local Union 19 of Cleveland, Ohio ("Bakers"); Teamsters, Chauffeurs, Warehousemen & Helpers, Local Union 377 ("Teamsters"); and the International Association of Machinists, Aerospace Workers, AFL/CIO Lodge 1519 ("Machinists").

The debtor's application was duly scheduled for hearing. The court, after considering the evidence, testimony, exhibits, and briefs now makes the following Finding of Fact and Law.

## FINDING OF FACT

1. Pesce Baking Co., Inc. filed a voluntary petition under Chapter 11 of the Bankruptcy Code with this court on March 30, 1984. The debtor has been located in Youngstown, Ohio for approximately 69 years and was incorporated on April 1, 1967. The debtor is a bakery specializing in Italian breads and pastries.

2. The debtor has listed on its schedules priority claims of $60,299.26, unsecured claims of $112,256.98, and secured claims of $295,365.84. Of the priority claims listed, $56,858.00 represents claims for employee benefit plans and for vacation pay. The debtor has scheduled assets worth $599,730.33.

3. The debtor is a family-run business. The chairman of the board and the majority stockholder is Thomas Pesce, Sr. The other stockholders are members of the Pesce family. In addition to Mr. Pesce, Sr. seven other family members are employed by the debtor.

4. The debtor has operated as a union bakery for approximately 19 years.

5. The debtor entered into its present collective bargaining agreement with the Bakers on May 1, 1982. This agreement is scheduled to remain in force until May 1, 1985.

6. Article IV of the Bakers' collective bargaining agreement provides that minimum wages for employees under the various job classifications ranged from $5.55 per hour to $4.70 per hour as of May 1, 1982. Wages were scheduled to increase yearly. By May 1, 1984 wages were scheduled to range from $6.45 per hour to $5.60 per hour. The average take home pay of employees covered under the Bakers' agreement is $200.00 per week.

7. The debtor is obligated under the Bakers' agreement to make contributions to an employee health and welfare fund established by the Bakers' union. The debtor agreed to contribute into this fund, effective May 1, 1982, $40.00 per employee per week. The debtor agreed to increase the contribution to $45.00 per employee per week effective May 1, 1983. A further increased contribution to $49.00 per employee per week was to become effective on May 1, 1984.

8. The Bakers' collective bargaining agreement also obligates the debtor to make contributions to a pension fund established by the Bakers' union for the benefit of its members. The debtor's contribution to the pension fund, in terms of amount and scheduled increases, is the same as that to the health and welfare fund described above.

9. The Bakers' agreement also obligates the debtor to make contributions to a Charitable, Educational, and Recreational Fund, which is denominated in the agreement as the CER fund. The agreement provides that the debtor's contribution to the CER fund shall be $2.50 per employee per week. There are no scheduled contribution increases to this fund.

10. There was no testimony of the number of employees covered under the Bakers' agreement. This number can, however, be approximated from the other evidence. A copy of the debtor's Payroll Master Listing of September 11, 1984 (Defendants' Exhibit 3) lists the names of forty-one individuals including, apparently, management personnel. Unfortunately this copy is of poor quality. It appears that some of the individuals listed on the Master Listing are no longer employed by the debtor. (There was testimony that the debtor presently employs thirty employees.) The Master Listing also contains the names of non-union employees who perform jobs which are covered under the collective bargaining agreements. (See Finding of Fact Paragraph 38, *infra*.) In considering all of this evidence, the court finds that no more than twelve of the debtor's employees are members of the Bakers' union. The actual number might well be less than twelve but the court cannot determine the actual number on the evidence before it.

11. The debtor entered into its present collective bargaining agreement with the Teamsters on January 21, 1982. This agreement is scheduled to remain in force until January 20, 1985 inclusive.

12. The Teamsters' agreement provides that driver-salesmen shall be paid a weekly base pay of $86.50 plus 8 percent commission on net weekly sales. The agreement provides for a wage guarantee of $150.00 per week. The average take-home pay of employees covered under the Teamsters' agreement is $200.00 per week.

13. The Teamsters' agreement also provides for a health and welfare fund. The agreement provides that effective January 21, 1982 the debtor's contribution to the fund shall be $41.50 per employee per week. Effective September 1, 1982, the debtor's contribution shall be $44.50 per employee per week.

14. The Teamsters' agreement also stipulates that the debtor shall make contributions to the Central States Southeast & Southwest Areas Pension Fund. Effective January 21, 1982 the debtor's contribution shall be $33.00 per employee per week. Effective January 21, 1983 the debtor's contribution rises to $37.00 per employee per week and effective January 21, 1984

the contribution rises to $41.00 per employee per week.

15. Both the Teamsters' and the Bakers' agreements provide that all employees covered by the respective agreements shall become members of the respective unions as a condition of employment. The Teamsters' agreement does contain an exception to this requirement in the case of an emergency provided that the union is notified of the emergency.

16. The debtor entered into its collective bargaining agreement with the Machinists on September 1, 1981. This agreement expired on September 1, 1984. The agreement covered only one of the debtor's employees. The Machinists did not oppose the debtor's application and did not appear at the hearing.

17. The debtor files corporate income tax returns for taxable years ending March 31 of each year. The debtor submitted income tax returns for 1978, 1979, 1980, 1981 and 1982 (Petitioner's Exhibits B, C, D, E, and F). The debtor did not submit a 1983 tax return but did submit a financial report for the twelve-month period ending March 31, 1984 which report supplies the data for the debtor's 1983 taxable year (Petitioner's Exhibit I). From these exhibits it appears that the debtor's gross sales and profit or loss for the past six are as follows:

| Year | Sales | Profit (or loss) |
| --- | --- | --- |
| 1978 | $1,203,571 | $26,067 |
| 1979 | $1,336,012 | $23,101 |
| 1980 | $1,460,577 | $39,835 |
| 1981 | $1,531,729 | ($12,773) |
| 1982 | $1,322,744 | ($61,736) |
| 1983 | $1,218,859 | ($120,589) |

18. The debtor also submitted a financial statement for the five-month period ending August 31, 1984 (Petitioner's Exhibit K). This statement indicates that the debtor had total sales of $493,574 and a net loss of $58,641 for the period.

19. Direct labor costs were 30.78 percent of gross sales for the five-month period ending August 31, 1984. According to the debtor, labor costs have generally been approximately 30 percent of the gross sales. In contrast, administrative expenses

have risen. For the five-month period ending August 31, 1984 they were 47.5 percent of gross sales. For the taxable year ended March 31, 1984 administrative expenses were approximately 45 percent of gross sales. For the 1979 taxable year ended March 31, 1980, administrative expenses were approximately 34 percent of gross sales (Petitioner's Exhibit A). The dominant factor in the increased administrative expense over the last years is the increased depreciation expense. The further 2 percent increase for the five-month period ended August 31, 1984 is mostly attributable to an increased expense for professional services.

20. The debtor has attributed its losses to the depressed economic climate in the Youngstown area and the fact that large grocery stores have established in-house bakeries.

21. The debtor met once with representatives of the Bakers and the Teamsters to discuss modifications to the collective bargaining agreements. The union representatives also met once with Thomas Anness, the debtor's accountant, to discuss the debtor's financial statements.

22. The debtor submitted a pro forma income statement for the fiscal year ending March 31, 1985, in which the debtor projects sales for said year to be $1,100,000 (Petitioner's Exhibit G). Although, as of August 31, 1984 the debtor's sales are running slightly ahead of the projected yearly sales, Mr. Anness testified that, considering the seasonal fluctuations of sales, the pro forma yearly projection of sales appears to be substantially correct.

23. The debtor's pro forma projects a loss for the 1984 tax year of $188,000 if the union were to offer no concessions to the terms of the collective bargaining agreements.

24. Petitioner's Exhibit H is a list of requested concessions which the debtor proposed to the unions. The concessions, along with the debtor's corresponding projected yearly savings, are as follows:

| Proposed Concessions | Estimated Savings |
|---|---|
| 1. wage freeze | $ 23,000 |
| 2. elimination of pension benefit | $ 60,000 |
| 3. substitute group insurance for health and welfare fund | $ 18,000 |
| 4. elimination of CER fund | $ 1,700 |
| 5. 50 percent reduction of holidays, personal days, and vacation | $ 26,500 |
| Total | $129,200 |

25. Even with the above proposed concessions, the debtor's pro forma income statement projects a loss for the fiscal year of $58,800.00 (Petitioner's Exhibit G). On direct examination, Mr. Anness testified that, in computing this projected loss, he included a projected depreciation expense of approximately $90,000.00. Thus, according to Mr. Anness, the debtor would still suffer a loss for tax purposes; but, if these proposed concessions were granted, it would have a positive cash flow.

26. On cross-examination, Mr. Anness admitted that some of the projected savings in Petitioner's Exhibits G and H are incorrect. He admitted that the actual savings from the elimination of the pension benefits would be approximately $35,000.00; the $60,000.00 figure was based on the number of union employees employed by the debtor at the time the pro forma was prepared. Mr. Anness also testified that the actual savings to be realized by substituting the Blue Cross group insurance benefits for the unions' health and welfare plan is approximately $100.00 per employee per year. Since eight of the debtor's employees are members of the Teamsters and no more than twelve (and probably less) are members of the Bakers, the debtor will only save approximately $2,000.00 per year by eliminating the unions' health and welfare plan.

27. The unions have agreed to the wage freeze and the 50 percent reduction of holidays, personal days, and vacations. Additionally, the Bakers' union has agreed to the elimination of the CER fund. The unions have refused to make any concessions regarding the pension funds or the health and welfare funds.

28. The debtor presently provides Blue Cross group insurance benefits to its non-union employees. There is no dispute that the benefits provided under the Teamsters and Bakers respective health and welfare funds are far superior to the benefits under the debtor's group insurance plan. Neither the unions nor the debtor elaborated on the specific differences between the different health plans. Nor did any of the parties provide the court with testimony or evidence of the particulars of any of the health plans.

29. Both the Teamsters and the Bakers assert that the pension benefits are the most important benefits to their members under their respective collective bargaining agreements. Both unions assert that their members accepted low pay because of the pension benefits provided under the collective bargaining agreement.

30. Dan Brott is a secretary-treasurer for the Teamsters. He testified that the debtor first entered into a collective bargaining agreement with the Teamsters in 1965 at which time the debtor began making contributions into the Central States Southeast and Southwest Areas Pension Fund. He testified that employees' rights under the pension fund become vested after ten years and that members are eligible for full benefits after twenty years. He testified that when an employer agrees to make contributions to the pension fund under the terms of a collective bargaining agreement its employees receive a credit, for purposes of computing pension benefits, for the time they worked before the employer began making contributions to the pension fund. If the employer drops out of the pension fund program, then the employees lose any credit for the time they worked before the employer began making contributions to the pension fund.

31. The debtor presently employs eight driver-salesmen who are members of the Teamsters. One of these employees, Joseph Moderelli, has worked for the debtor for 24 years. If the collective bargaining

agreement were rejected, he would lose credit for the five years he worked prior to 1965 when the debtor first began making contributions to the pension fund. Accordingly, Mr. Modarelli would not be eligible for full benefits, but would, according to Mr. Brott, be entitled to only 44 percent of full pension benefits or, under the present schedule, approximately $236.00 per month. If the collective bargaining agreement were not rejected, Mr. Modarelli would be entitled to full pension benefits.

32. Carmen Giannini and Dominic Naples are also members of the Teamsters and they have worked for the debtor for 17 years and 16 years, respectively. Although these employees would not lose credit if the collective bargaining agreement were rejected, they would lose the opportunity to obtain full pension benefits.

33. Mr. Brott also testified that the Teamster members employed by the debtor have not had a raise for the past nine years although they have obtained increases in pension benefits. He testified, and the court finds, that they are grossly underpaid in comparison with drivers of other bakeries.

34. The Teamsters submitted a copy of its collective bargaining agreement with other bakeries in the Youngstown area (Defendants' Exhibit 2). Under this agreement, drivers are paid a basic wage, effective July 12, 1981, of $165.00 per week plus a 9 percent commission on net sales per week. The agreement provides that the basic wage rises to $180.00 per week, effective July 11, 1982 and $195.00 per week, effective July 10, 1983. In addition, this agreement provides for a higher guaranteed minimum wage than that provided for the debtor's employees. Under this agreement, drivers are guaranteed $240.00 per week effective July 12, 1981; $255.00 per week effective July 11, 1982; and $270.00 per week effective July 10, 1983. Finally, defendants' Exhibit 2 obligates employers to make higher contributions to the health and welfare and pension funds than is the case under the union's agreement with Pesce.

35. On cross-examination, Mr. Brott admitted that defendant's Exhibit 2 applies only to the larger bakeries such as Schwebels and that the smaller bakeries such as Warren Baking Co. and Macedonia Baking Co., which directly compete with the debtor, are not unionized. None of the parties offered any evidence of the wages and benefits of the employees of the smaller baking companies.

36. At the hearing, the Teamsters presented evidence that although the debtor makes deductions from employees' wages for union dues, the debtor has failed to timely remit said deductions to the union (Defendants' Exhibit 1). Both the Teamsters' and the Bakers' collective bargaining agreements require the debtor to deduct union dues from the employees' pay and remit them to the respective unions.

37. The debtor has also failed to make all of its scheduled contributions to the union health and welfare and pension funds.

38. The debtor is presently employing non-union drivers and other non-union employees in violation of its collective bargaining agreements with the Teamsters and Bakers (Defendants' Exhibit 3). Four non-union drivers have been hired since the debtor filed its petition. The last non-union driver hired was Curtis Wilson, hired on August 6, 1984; Mr. Wilson is the son-in-law of Thomas Pesce, Sr. Other non-union drivers were hired before the debtor filed its petition. These included Thomas Pesce, Jr., the son of the debtor's chairman of the board. Thomas Pesce, Jr. has worked for the debtor for more than five years without joining the union.

39. Thomas Pesce, Sr. testified that he is not anti-union. He testified that his son, Thomas, Jr., did not want to be in the union. He also said that his son is not only a driver but also works in the office; that he worked in the office for four to five weeks in July when he fell off a roof and couldn't drive. He testified that the other non-union drivers also told him they did not want to be in the union. Mr. Pesce said that he knew these people did not want to

be in the union but he decided to hire them anyway.

40. Robert Pesce, another son of Thomas Pesce, Sr., is also employed by the debtor. Unlike his brother, Robert is and has been a member of the Teamsters for the past eleven years. Thus, Robert is now eligible for partial benefits under the Teamsters' pension plan. It is undisputed, however, that Robert has been a general manager for the past three years and hence is not in a class of employees covered by any of the collective bargaining agreements. Thomas Pesce, Sr. testified that he knew that the unions had better pension and health and welfare plans and that he did not want Robert to lose those benefits after he became a general manager.

41. Other than the debtor's present application to reject these collective bargaining agreements, there has been no evidence that the debtor has sought other means of controlling its costs.

42. The debtor continues to pay the travel and entertainment expenses, including County Club dues of Thomas Pesce, Sr. There was no evidence what percentage of these expenses are actually business related. Nor was there any evidence of whether these expenses actually help generate sales for the debtor.

43. The debtor has not proposed any plan of reorganization or indicated whether it will be able to file a plan of reorganization if the court allows rejection of the union collective bargaining agreements.

## ISSUE

The issue is whether the court should grant the debtor's motion to reject its collective bargaining agreements with the unions.

## LAW

The briefs of the parties raise a threshold issue concerning the law applicable to this matter. Counsel for the Bakers' union, in his post-hearing brief, argues, *inter alia*, that, under 11 U.S.C. section 1113, this court should not approve the debtor's application to reject the collective bargaining agreements. Counsel is under the mistaken impression that 11 U.S.C. section 1113 applies to this proceeding.

■ Section 1113 was added to the Bankruptcy Code by the recently enacted Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. 98–353, 98 Stat. 333 ("BAFJA"). Section 541 of BAFJA is the specific provision which added 11 U.S.C. section 1113 to the Bankruptcy Code. Section 541(c) of BAFJA provides that "this section shall not apply to cases filed under title 11 of the United States Code which were commenced prior to the date of enactment of this section". BAFJA was enacted on July 10, 1984, on which date President Reagan signed the Act. The debtor commenced this case on March 30, 1984 when it filed its petition. Thus, section 1113 of the Bankruptcy Code does not apply to this proceeding.

The statutory source of the debtor's application is 11 U.S.C. section 365(a). This section provides that, with exceptions not here relevant, and subject to court approval, the trustee or the debtor in possession "may assume or reject any executory contract or unexpired lease of the debtor". Unlike the newly enacted section 1113 of the Bankruptcy Code, section 365(a) does not elaborate on the standards under which a collective bargaining agreement may be rejected.

■ Most courts have applied the so-called "business judgment test" when considering an application to reject an ordinary executory contract. *In re Chi-Feng Huang*, 23 B.R. 798, 9 B.C.D. 972 (BAP 9th Cir.1982); *In re Hurricane Elkhorn Coal Corp. II*, 15 B.R. 990 (Bkrtcy.W.D.Ky. 1981); *In re Marina Enterprises, Inc.*, 14 B.R. 327, 8 B.C.D. 59 (Bkrtcy.S.D.Fla.1981). A court will approve the rejection of an executory contract under the business judgment test if rejection would benefit the debtor's estate.

■ The business judgment test does not apply where the executory contract sought to be avoided is a collective bargaining agreement subject to the provisions of the NLRA, 29 U.S.C. section 151 et seq.

The Supreme Court has held that because a collective bargaining agreement creates a "law of the shop" to promote labor peace, a stricter standard must apply to its rejection under the Bankruptcy Code. *National Labor Relations Board v. Bildisco and Bildisco, (Bildisco),* —— U.S. ——, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). Under this standard a court should approve rejection "if the debtor can show that the collective bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract". *Id.* —— U.S. at ——, 104 S.Ct. at 1196. This is the standard which the court must apply in the present case.

The *Bildisco* test presupposes that the collective bargaining agreement is an executory contract. The Bankruptcy Code does not define "executory contract". Courts have uniformly followed the definition of Professor Countryman who defines an executory contract as one: "under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other." Countryman, *Executory Contracts in Bankruptcy*, 57 Minn.L.Rev. 439, 460 (1973) quoted in *Gloria Mfg. v. International Ladies Garment Workers*, 734 F.2d 1020, 1022 (4th Cir.1984). *See also, In re Cochise College Park, Inc.*, 703 F.2d 1339 (9th Cir.1983); *In re Fashion Two Twenty, Inc.* 16 B.R. 784, 8 B.C.D. 839 (Bkrtcy.N.D.Ohio 1982); *In re Mimi's of Atlanta, Inc.*, 5 B.R. 623, 6 B.C.D. 807 (Bkrtcy.N.D.Ga.1980), Aff'd. 11 B.R. 710 (1981).

 In the present case, the debtor's collective bargaining agreement with the Machinists expired of its own terms before this court could hold a hearing on the debtor's application. Thus, at the present time, the debtor's collective bargaining agreement with the Machinists is not an executory contract. It has expired and there can be no performance by either party under the terms of the agreement.

The critical date for determining the executory nature of a contract is the date on which the bankruptcy court considers the debtor's application. *Gloria Mfg. v. International Ladies Garment Workers, supra; In re Total Transportation Service, Inc.*, 37 B.R. 904, 11 B.C.D. 872 (Bkrtcy.S.D.Ohio 1984). Although a collective bargaining agreement may be executory on the date the debtor's bankruptcy petition is filed, once the agreement expires of its own terms, the debtor's application to reject it becomes moot. *Gloria Mfg. v. International Ladies Garment Workers, supra.* It follows that this court must deny the debtor's application to reject its collective bargaining agreement with the Machinists because the agreement is no longer executory.

The debtor's collective bargaining agreements with the Teamsters and the Bakers have not expired. Since these agreements are still executory, the debtor may seek to reject them pursuant to section 365(a) of the Bankruptcy Code.

As mentioned above, *Bildisco* requires the debtor to meet a two-prong test before the court should allow the debtor to reject a collective bargaining agreement. Under the first prong the debtor must establish, and the court must find, that the agreement "burdens the estate".

What must the debtor show to establish that the agreements "burden the estate"? Since rejection of collective bargaining agreements is governed by a higher standard than rejection of other executory contracts, it is clear that the debtor's proof must be stricter than that required under the business judgment test. Thus, the debtor must show more than that the estate would benefit from rejection. *Bildisco, supra,* —— U.S. at ——, 104 S.Ct. at 1195; *In re Brada Miller Freight System, Inc.*, 702 F.2d 890, 897–98 (11th Cir.1983). At the other extreme is the standard adopted by the Second Circuit in *Brotherhood of Railway and Airline Clerks v. REA Express, Inc.*, 523 F.2d 164 (2d Cir. 1975), *cert. denied*, 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975), under which rejection is permitted only if the debtor can show that its reorganization will fail if it is

not permitted to reject the collective bargaining agreement. The Supreme Court has refused to follow the *REA Express* standard because it "is fundamentally at odds with the policies of flexibility and equity built into Chapter 11 of the Bankruptcy Code". *Bildisco, supra,* —— U.S. at ——, 104 S.Ct. at 1196. The burdensome test adopted by *Bildisco,* therefore, appears to be a compromise between the business judgment test and the *REA Express* test. The debtor must prove more than the fact that rejection will benefit the estate, but the debtor need not prove that absent rejection all efforts at reorganization will fail.

At first blush, one might assume that all collective bargaining agreements burden the estate. Such an assumption is too simplistic. It is more likely that a collective bargaining agreement imposes benefits and burdens alike, on each of the parties. From the employer's standpoint one of the chief benefits of a collective bargaining agreement is the union's promise not to strike. As this court recently stated:

> [E]ven if the contract is rejected, [the debtor] must still bargain with the union. *Bildisco, supra; In re Brada Miller Freight System, Inc., supra.* If a subsequent agreement were not reached, a strike could result. If this were the result, then, with the wisdom of hindsight, the contract may not have seemed so burdensome.

*In re C. & W. Mining Co., Inc.,* 38 B.R. 496, 503, 11 BCD 792, 797 (1984). In fact, in one recent case, union employees did go out on strike after their collective bargaining agreement was rejected by a bankruptcy court. *See, Briggs Transportation Co. v. International Brotherhood of Teamsters,* 739 F.2d 341 (8th Cir.1984).

Recent decisions from other bankruptcy courts illuminate the circumstances under which collective bargaining agreements have been found to be burdensome. *See e.g. In re Briggs Transportation Co.,* 39 B.R. 343, 11 BCD 1066 (Bkrtcy.Minn.1984); *In re Rath Packing Co.,* 36 B.R. 979, 11 BCD 498 (Bkrtcy.N.D.Iowa 1984). In holding that the collective bargaining agreements were burdensome, these courts found that the agreements imposed restrictive work rules which increased costs and reduced efficiency and competitiveness. These courts also found that the debtors' employees were paid wages higher than those paid by the debtors' competitors. In *Briggs Transportation,* the debtor's wage costs amounted to 70 percent of gross revenues, but the industry standard was between 56 percent and 60 percent. *In re Briggs Transportation Co., supra,* 39 B.R. at 351, 11 BCD at 1071. Both courts also found that the pension and health care plans imposed burdens on the debtor. In this regard the *Rath Packing* court specifically found that if the agreements were rejected the employees could obtain better health insurance and the debtor could significantly reduce its health care costs. *In re Rath Packing Co., supra,* 36 B.R. at 991, 11 BCD at 506.

Few of these circumstances are present in the matter before the court. The debtor has not argued, and has not presented any evidence, that the agreements impose restrictive work rules which create a burden. Furthermore, the court now finds that the wages paid to the debtor's employees do not create a burden to the debtor. At an average take-home pay of approximately $200.00 per week, it appears that the employees are underpaid. Direct labor costs have remained at approximately 30 percent of gross sales even though sales have declined over the past years. At any rate, the employees have agreed to a wage freeze. Thus, the debtor has attained its objective regarding wages without having to reject the agreements.

The employees have not, however, agreed to eliminate their health and welfare plans or their pension plans. The debtor's original estimate of the expected savings to be realized from the elimination of these benefits proved to be overstated. All the parties agree that the employees enjoy superior benefits under their respective health plans. The substitution of the group insurance benefits for the union health and welfare benefits would result in only minimal savings for the debtor. Thus

any benefit to be attained by rejection must likewise be considered minimal.

The debtor argues that the pension plans do impose a definite burden upon the estate. Although the debtor's original estimate of savings has proved incorrect, the evidence indicates that the debtor can save approximately $35,000.00 by the elimination of the pension plans. Thus to the extent that the debtor will realize some savings by rejecting the collective bargaining agreements, the agreements can be considered "burdensome".

■ The court cannot, however, consider the effect of the pension plans in a vacuum. *Bildisco* requires the debtor to show that the collective bargaining agreements as a whole are burdensome. Thus, the fact that certain provisions create a burden is not decisive.

■ The unions have agreed to all the concessions proposed by the debtor except those relating to health and welfare and pension benefits. Thus the only thing to be gained by the rejection of the agreements is the possible elimination of these benefits. Based on the debtor's projected sales revenue for the fiscal year, this represents a savings of less than 4 percent of gross sales. Even this savings may not be realized. The debtor must still bargain with the unions even if the agreements are rejected. *Bildisco, supra; In re Brada Miller Freight System, Inc., supra; In re C. & W. Mining Co., Inc., supra.* Considering the importance which the union members attach to their pension benefits, there is no guarantee that they would accept the elimination of these benefits. A strike against the debtor is a distinct possibility. The Bankruptcy Code does not prohibit the union members from waging a strike against the debtor. *Briggs Transportation Co. v. International Brotherhood of Teamsters, supra; In re Crowe & Associates, Inc.,* 713 F.2d 211 (6th Cir.1983) (per curiam); *In re Petrusch,* 667 F.2d 297 (2d Cir.1981) (per curiam), cert. denied 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1982).

■ The issue is close; but, considering all the evidence, the court finds that the debtor has failed to show that the collective bargaining agreements burden the estate. The debtor has already attained some savings without the need to reject the labor agreements. Further savings from the rejection of the agreements would be minimal at best. Even these minimal savings might not be realized. The failure to achieve these projected minimal savings cannot be considered to burden the debtor's estate.

Turning to the second prong of the *Bildisco* test—the balancing of the equities—the court finds that the evidence is more conclusive. The equities clearly balance in favor of denying the debtor's application to reject the collective bargaining agreements.

In *In re C. & W. Mining Co., Inc., supra,* this court found that one of the most important factors to consider in balancing the equities is the good or bad faith of the parties in seeking to resolve their differences. *Id.* 38 B.R. at 502–03, 11 B.C.D. at 796–97. Both the Bakers and the Teamsters have argued extensively in their post-hearing briefs that the debtor has not acted in good faith.

■ Not all of the unions' arguments have merit. The fact that the debtor has asked for concessions does not indicate bad faith. Nor was the debtor acting in bad faith for seeking to reject the labor contracts. The debtor has this right under the Bankruptcy Code. The fact that the debtor has not kept current on its contributions to the pension and health and welfare plans, although troubling to this court, is not by itself indicative of bad faith. Most debtors who seek relief under the Bankruptcy Code have unpaid debts.

■ Nevertheless, there is evidence to support the unions' argument of bad faith. The debtor has breached its collective bargaining agreements by hiring non-union employees. Four of these employees have been hired since the debtor filed its bankruptcy petition. The hiring of non-union employees was not a mistake. The court concludes from the testimony of Thomas Pesce, Sr. that the debtor knowingly violat-

ed its collective bargaining agreements by hiring these non-union employees. Although Mr. Pesce, Sr. claims he is not anti-union, the effect of his hiring practices has been to replace union employees with non-union employees.

The debtor has also allowed Robert Pesce to remain in the Teamsters union even though Robert is a general manager and for the last three years has not performed a job covered by the Teamsters' agreement. Thomas Pesce, Sr. testified that he wanted his son Robert to remain in the union so that he wouldn't lose the union benefits. Robert now arguably qualifies for partial benefits under the Teamsters' plan. Had he quit the union when he became general manager, he would not have qualified.

This is bad faith. The debtor, through its chairman and major stock-holder, Thomas Pesce, Sr., has violated the union contracts for the benefit of individual members of the Pesce family. Some members of the Pesce family have been hired as non-union employees in violation of the collective bargaining agreements, while Robert Pesce has been wrongfully allowed to remain in the union so that he will be eligible for a pension. Now that Robert is eligible, the debtor seeks to terminate future payments into the pension plan.

The debtor has also violated the agreements by failing to remit to the unions the dues which it has deducted from the wages of union employees. The debtor's need for cash does not excuse this behavior. This also is indicative of bad faith.

The court finds that the unions have acted in good faith in seeking to reach an accommodation with the debtor. The unions agreed to three of the five original concessions proposed by the debtor. They made meaningful concessions by agreeing to freeze wages and reduce holidays and vacation days. Certainly they tried to meet the debtor halfway. Considering the wages paid the employees, this court cannot find that they acted in bad faith by initially refusing to eliminate the pension and health benefits.

Another of the equities to consider is the cost-spreading abilities of the parties. *In re Brada Miller Freight System, Inc., supra; In re C. & W. Mining Co., Inc., supra.* Here again the equities clearly balance in favor of the unions. If the agreements were rejected, the hardship to the individual employees would be disproportionate to the benefit to the debtor. The union members have accepted low wages because they were promised superior retirement and health benefits. If they lose their pension benefits, they will have to bear the loss themselves. On the other hand, it is conceivable that the debtor can spread the cost of preserving these benefits. The debtor has failed to seek savings elsewhere. If the debtor can hire four non-union employees, including the son-in-law of Thomas Pesce, Sr., after it filed its petition, as well as continue to pay Mr. Pesce's country club dues, then it can continue to pay for the union benefit plans.

Certainly one of the most important factors to consider in balancing the equities is the possibility of liquidation both with and without rejection of the collective bargaining agreements. *Bildisco supra; In re Brada Miller Freight System, Inc., supra; In re C. & W. Mining Co., Inc., supra.* The Supreme Court made this point in explicit language:

> Since the policy of Chapter 11 is to permit successful rehabilitation of debtors, rejection should not be permitted without a finding that that policy would be served by such action. The Bankruptcy Court must make a reasoned finding on the record why it has determined that rejection should be permitted. Determining what would constitute a successful rehabilitation involves balancing the interests of the affected parties—the debtor, creditors, and employees. The Bankruptcy Court must consider the likelihood and consequences of liquidation for the debtor absent rejection, the reduced value of the creditors' claims that would follow from affirmance and the hardship that would impose on them, and the impact of rejection on the employees.

*Bildisco, supra,* —— U.S. at ——, 104 S.Ct. at 1197.

The debtor has not yet filed a plan of reorganization nor has it indicated that it will be able to file a plan should this court permit it to reject its collective bargaining agreements. According to the debtor's ˋ original estimate it would still lose money if the agreements were rejected. In fact, the court has found that the debtor's projected savings have been overstated. Nonetheless, the debtor insists that if rejection is permitted, it will have a positive cash flow, however minimal, despite a loss for tax purposes.

The debtor cannot remain in business indefinitely by using its depreciation expense to meet cash requirements. Eventually the debtor would have to reinvest in trucks and other capital assets. The debtor has not indicated how this will be possible even if the agreements are rejected.

Given this uncertain financial future, will rejection contribute to a successful reorganization? The above quoted passage from *Bildisco* indicates that a successful reorganization must be determined by balancing the interests of the debtor, the creditors, and the employees.

From the employees' standpoint, a reorganization in which they lost their health and welfare and pension benefits would hardly be considered successful. The financial and psychological impact of losing their pension plan after years of accepting low wages cannot be downplayed. The employees will have sacrificed for an unfulfilled promise. The court has already mentioned that in such circumstances, the possibility of a strike cannot be discounted. Even without a strike the employees' disappointment could result in decreased productivity.

From the debtor's viewpoint a successful reorganization is its fundamental goal. The court has found that the debtor can realize a savings, at most, of less than 4 percent of projected revenues if the agreements are rejected. Considering the risk of a strike or decreased productivity, this projected savings is highly speculative. The court finds, therefore, that rejection of the collective bargaining agreements will not contribute to a successful reorganization of the debtor.

This is not to say that the debtor cannot be reorganized. As the court has already mentioned, the debtor did not present evidence that it has sought other means of controlling costs. Other means should be explored. It might also adopt a different market strategy to increase sales.

The court, therefore, rejects the debtor's claim that it must decrease labor costs by rejecting these agreements if it is to reorganize. The debtor's argument is defeated by its own actions in hiring a number of non-union employees. Rejection of the collective bargaining agreement will more likely benefit members of the Pesce family than the debtor itself.

Finally the court must consider the creditors' interest. Obviously they would prefer to see the debtor successfully reorganized. But if reorganization is not possible, it is doubtful they would suffer a loss disproportionate to the employees. The debtor's schedules indicate it has a positive net worth. Thus, in the event of liquidation, the creditors could expect a substantial dividend on their claims.

The employees would suffer the most from liquidation. They would lose their jobs. Thus, they have a strong incentive to see the debtor reorganize. Rejection of the collective bargaining agreements is not likely to contribute to the debtor's reorganization. On the contrary, rejection is more likely to lead to liquidation by destroying employee morale.

Finally, the court notes that the debtor's collective bargaining agreement with the Teamsters is scheduled to expire on January 20, 1985. The Bakers' agreement expires May 1, 1985. Considering the minimal savings, if any, to be gained from rejection, the equities clearly balance in favor of denying the debtor's application for rejection. The debtor's position is not likely to worsen appreciably during the remaining term of the agreements. The debtor will be able to pursue its request for

**962**

concessions during the contract negotiations which will be held in a few months.

## CONCLUSION

The debtor's motion to reject its collective bargaining agreements with the Machinists, Bakers, and Teamsters must be denied. The agreement with the Machinists has expired; it is not an executory contract and hence may not be rejected. Although rejection of the Bakers and Teamsters agreements might benefit the estate, the court cannot find that the agreements burden the estate. Even if the agreements did burden the estate, the court has found that the equities balance in favor of the unions and against the debtor. At least some of the activities of the debtor appear to have been motivated by bad faith toward the unions. Rejection would cause the union employees to bear a disproportionate sacrifice considering the nebulous benefits to the debtor. Finally, rejection will not contribute to any potential reorganization of the debtor.